[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 122 
The appeals in these two proceedings present, with a single exception, the same questions for review, and, therefore, in this opinion may be considered together — the exception, which occurs in the 1909 assessment, being treated separately. The assessment for the year 1908 was reviewed by the Special Term of the Supreme Court in the county of Albany, which court reduced the valuation as fixed by the state board of tax commissioners almost one-half. On appeal the Appellate Division of the third department reversed the decision of the Special Term both on the facts and the law, and confirmed the action of the state board, except that it reduced said valuation by the amount of 11%, it appearing by stipulation of the parties that the average assessed valuation of real estate in the city of New York for the year in question was 89%.
On a certiorari to review the assessed valuation for the year 1909 the Special Term in the county of New York wholly confirmed the action of the state board. The Appellate Division, first department, modified this determination in one respect, reducing the assessed value by the amount of 11% on the same principle on which the action of the Appellate Division in the other proceeding was based, and from these final orders the relator and the intervenor, the city of New York, have taken appeals to this court.
The controversy in these cases presents chiefly questions of fact which this court cannot review, provided there is any evidence to sustain the findings of the courts below, and unless the relator is right in certain propositions of law which it contends should govern assessments of this class. That there is evidence to sustain the determinations of the state board is reasonably clear. The expert evidence shows that the assessed valuation of the tangible property does not exceed the cost of reproduction. The relator, however, contends that the cost of reproduction does not necessarily determine the value of *Page 124 
the property. That proposition may be conceded, but nevertheless it is some evidence of value. In 1908 no part of the relator's tunnel, structures and roadway was so far completed as to enable it to put any part of its railroad in operation. It may possibly happen that when the work is completed and the railroad operated, the enterprise will turn out to be so unremunerative as to make the tangible property worth less than the cost of reproduction. On the other hand, it may be that the expectations of the promoters of the enterprise will be realized or exceeded and the road prove highly profitable. The promoters evidently had faith in it, for they continued its prosecution. There is no claim that there has been any mistake in the plans or construction of the work which necessitates the abandonment or replacing of any part of the structure and the substitution of a new structure. Under these circumstances, we think until it is shown by actual experience that the structure is worth less than the cost of reproduction, such cost is the best evidence of value.
It is contended by the relator that until the work under the special franchise had progressed so far as to constitute a railroad, it was not assessable under the Special Franchise Act. To this we can only answer, why? A house partly constructed but not completed is taxed at the value of the structure as it exists at the time of the assessment, and the same is true of a partially completed railroad running through the country. If under the general laws existing before the enactment of the Special Franchise Tax Act, the uncompleted structure of the relator would be taxable, it certainly was not the intent of the special franchise statute to relieve it from taxation.
It is next urged that as the intangible property of the relator, to wit, the right to use the streets, was found in the assessment of 1908 to be of no value, the state board had no jurisdiction to assess the tangible property of the relator. Again, we can only answer, why? The *Page 125 
right to enter the streets is, under the statute, unquestionably a special franchise and the state board is expressly directed by the statute to include as part of the special franchise the value of the tangible property. It is entirely possible that in some cases the intangible right may be of no value, nevertheless this cannot operate (except in the manner hereinbefore suggested) to reduce the value of the tangible property or to relieve the state board from the duty of ascertaining and determining its value.
Again, it is contended that the taxation of the relator's property is illegal because it imposes a burden upon interstate commerce. This claim hardly needs refutation. The streets and public places belong to the public. In the old city of New York the fee is in the city in trust for the public. No one has a right to use such streets for the purpose of a railroad except by virtue of a franchise proceeding from the state. That franchise is property which cannot be revoked except for cause, unless the right of revocation is reserved in the grant. (People v.O'Brien, 111 N.Y. 1.) It is difficult to see why the relator may not be taxed on such property the same as any other property situated within the state.
In one claim, however, we agree that the relator is right. As to what are termed the upper tunnels under the Hudson river, the relator had the right to construct and maintain those apart from the certificate granted by the rapid transit railroad commissioners of New York city. Such certificate does include the upper tunnels, but there is an express provision in it that the payment of $100 a year required by said certificate should not be considered a waiver of the rights which the grantee had to the bed of the Hudson river by deed from the state of New York. The Hudson Tunnel Railroad Company was incorporated under the laws of the states of New York and New Jersey for the purpose of building a railroad from the state of New Jersey under the Hudson river to and in the city of New York. By L. 1890, ch. 164, it *Page 126 
was allowed four years from the passage of the act to complete its tunnel and railroad. In June, 1890, it presented its petition to the commissioners of the land office for a right of way 160 feet in width and 40 feet in height beneath the lands under the waters of the Hudson river for the construction of its tunnels and the use of the company's railroad. Thereafter, and on February 24th, 1891, under the provisions of the General Railroad Act (L. 1850, ch. 140), and in pursuance of a resolution of the commissioners of the land office, the state of New York by letters patent granted to the said company the right of way asked for. The relator has succeeded to the rights and property of the said tunnel company. Therefore the tunnels and railroad of the relator on this part of its route, being constructed on its own right of way, are not to be deemed the exercise of a special franchise under the statute. A different view of this question seems to have been taken by the Appellate Division of the first department in a decision by a divided court (People ex rel.Bryan v. State Board of Tax Commrs., 142 App. Div. Div. 796) where it was held that the tunnels of the New York Long Island R.R. Co. under the East river between the boroughs of Manhattan and Queens in the city of New York were properly assessed by the state board of tax commissioners instead of the local authorities. The definition of a special franchise is found in subdivision 3 of section 2 of the Tax Law (Cons. Laws, ch. 60), which reads as follows:
"The terms `land,' `real estate,' and `real property,' as used in this chapter, include the land itself above and under water, all buildings and other articles and structures, substructures and superstructures, erected upon, under or above, or affixed to the same; all wharves and piers, including the value of the right to collect wharfage, cranage or dockage thereon; all bridges, all telegraph lines, wires, poles and appurtenances; all supports and inclosures for electrical conductors and other appurtenances upon, *Page 127 
above and under ground; all surface, underground or elevated railroads, including the value of all franchises, rights or permission to construct, maintain or operate the same in, under, above, on or through, streets, highways or public places; all railroad structures, substructures and superstructures, tracks and iron thereon; branches, switches and other fixtures permitted or authorized to be made, laid or placed in, upon, above or under any public or private road, street or ground; all mains, pipes and tanks laid or placed in, upon, above or under any public or private street or place for conducting steam, heat, water, oil, electricity or any property, substance or product capable of transportation or conveyance therein or that is protected thereby, including the value of all franchises, rights, authority or permission to construct, maintain or operate, in, under, above, upon, or through, any streets, highways or public places, any mains, pipes, tanks, conduits or wires, with their appurtenances, for conducting water, steam, heat, light, power, gas, oil or other substance, or electricity for telegraphic, telephonic or other purposes; all trees and underwood growing upon land, and all mines, minerals, quarries and fossils in and under the same, except mines belonging to the state. A franchise, right, authority or permission specified in this subdivision shall for the purpose of taxation be known as a `special franchise.' A special franchise shall be deemed to include the value of the tangible property of a person, copartnership, association or corporation situated in, upon, under or above any street, highway, public place or public waters in connection with the special franchise. The tangible property so included shall be taxed as a part of the special franchise. No property of a municipal corporation shall be subject to a special franchise tax."
An analysis of this section shows that a special franchise, so far as railroads are concerned, is the "rights or permission to construct, maintain and operate the same (railroads) in, under, above, on or through streets, highways *Page 128 
or public places." Of course, the Hudson river is a highway in the broad sense of that term, and its waters being subject to the ebb and flow of the tide, the title to the bed of the river was in the state. But navigable streams do not fall within the ordinary nomenclature of highways, unless the intent to include them is apparent. None such appears in this statute. Wharves and piers constructed in the navigable waters of the state, including the value of the right to collect wharfage, cranage or dockage, are to be assessed in the same manner as real estate, and are not enumerated as special franchises. The statute assessing for the purpose of taxation special franchises was undoubtedly intended, at least in the first instance, to reach the right to use the public streets by public service corporations, such as street railroad, lighting, telegraph and telephone companies — a valuable property right which had hitherto escaped taxation. Were it not for the amendments to the statute which have been from time to time enacted, I should doubt whether it was intended to include the mere crossing of public streets or highways by the ordinary general railroads constructed and operated upon their own rights of way. Such roads and structures had always been subject to taxation as other real estate. The amendments to that statute, however, have set that question at rest, and it cannot now be denied that the right of such railroad companies to cross intersecting streets and highways in existence at the time of their construction is, in certain cases, a special franchise within the statute. Outside of the limits of villages and cities such crossings are not special franchises, unless they exceed 250 feet in length.
In the present case the Hudson Tunnel Company was incorporated under the former General Railroad Act. By its incorporation it received from the state the franchise to build a railroad. To do that it was necessary that it should acquire title to the right of way on which the road was to be built. The land to be acquired belonged to the *Page 129 
state. The General Railroad Act (L. 1850, ch. 140, sec. 25) authorized the commissioners of the land office to grant to any railroad company formed under the act any land belonging to the state and required for the purpose of its road upon terms that might be agreed upon, or the company was authorized to acquire the same by appraisal in the same manner as the lands of individuals. The action of the land commissioners was not a grant to the company of any franchise. It was simply a grant of a title to land. Whether the letters patent conveyed a fee or an easement is immaterial. The company acquired by it such an interest in the land as authorized it to construct thereon its tunnels and railroad, not under any special franchise, but by virtue of its ownership of either land or an easement therein. As was pointed out by Judge EARL in Langdon v. Mayor, etc., of N.Y. (93 N.Y. 129), there are two distinct rights in navigable waters — ownership of the soil under water analogous to the ownership of dry land, regarded as a jus privatum vested in the crown, and the right to use and control both land and water, regarded as ajus publicum and vested in Parliament — both of which rights in this country are vested in the state. It was said by that judge: "The crown could convey the soil under water so as to give private rights therein, but the dominion and control over the waters, in the interest of commerce and navigation, for the benefit of all the subjects of the kingdom, could be exercised only by Parliament." (p. 155.) The right here granted was the private right or title to the soil, which in no way conflicted with or affected the rights of the public in the river. It is some privilege that has been given a party either in derogation of the public right, or as sharing in or by virtue of the public right that is a special franchise, not where all that has been done is done by virtue of the ownership of the soil or some interest therein. Thus, we are holding in a case decided at this time (People ex rel. N.Y. Central H.R.R.R. Co. v. Woodbury,203 N.Y. 167) that *Page 130 
where highways have been laid out across the rights of way of railroads subsequent to their construction, there exists no special franchise. I do not see how it is possible to differentiate this case from great portions of the New York Central railroad which, between New York and Albany, have for long distances been constructed within the bounds of the Hudson river under authority given that company's predecessor by the act of 1846 to so construct its road, and the title to the land' acquired from grant of the land commissioners. (N.Y. Central H.R.R.R. Co. v. Aldridge, 135 N.Y. 83.) Surely nobody has ever thought that that company was exercising any special franchise within the meaning of the statute, where the road runs in the bed of the river from point to point.
The principle which we have stated does not apply to the lower tunnels, the relator's right to construct and maintain which proceeds entirely from the grant of the rapid transit commission as a part of a continuous subway road under the streets of the city of New York and the waters of the Hudson to the state line. It follows that the upper tunnels should be assessed by the local officers of the city of New York as other property is assessed, and the assessment made by the state board should be reduced proportionately.
Accepting the cost of reproduction as proved in opposition to the relator's application for reduction as the fair value of the tangible property of the relator, it falls short of the assessment fixed by the state board for the year 1909 by something over $350,000. To support the assessment this discrepancy must be charged to the relator as the value of the intangible part of the special franchise. Personally I am of opinion that at this time no assessed value should be attributed to such privilege. It is true that no statute prescribes the net earnings rule as the method by which the value of a special franchise is to be computed, nor is there any decision of the courts that this method is to be exclusively adopted. It is also true that *Page 131 
that method of computation is not universally applicable. Nevertheless, in ordinary cases it is the best practical method that the taxing officers and the courts have as yet been able to evolve. I have said that in some cases it would be inapplicable; for instance: We all know that a franchise to maintain a street railroad on Fifth avenue in New York city would be worth a fortune and could be easily disposed of by the holder though not a rail had been laid or bought. If in that case the owner of the franchise were hawking it for sale, the mere privilege or franchise might probably be assessed at a large sum, its value being so great in proportion to the cost of the plaint necessary for the exercise of the franchise. In this case, however, the amount which it is necessary to invest in the construction of the relator's tunnels and railroads is very large and the return that it will ultimately derive therefrom uncertain. If the expectations of the promoters are realized the franchise will prove very valuable and will then be so assessed. If these expectations are disappointed — promoters' expectations are often disappointed — the value of the privilege or franchise may be very small. It appears that so far as the road was completed for operation in the year 1909, the net earnings over operating expenses were only the sum of $35,000, with which to pay taxes and interest upon millions of bonds outstanding. I think under such circumstances no present value should have been attributed to the franchise.
The city appeals from the reduction made by the Appellate Division of 11% from the valuation made by the state board to equalize such valuation with the assessment of other property in the borough. This is in accordance with the rule laid down by this court in People ex rel. Jamaica Water Supply Co. v. StateBoard of Tax Commrs. (196 N.Y. 39). There is no authority in the state board to assess special franchises at less than their full value, or to consider the general rate of taxation in any particular taxing district. In a recent *Page 132 
case (People ex rel. Manhattan Ry. Co. v. Woodbury, 143 App. Div. 905;203 N.Y. 231) the Supreme Court refused to reduce an assessment made on the relator's property in the borough of the Bronx so as to conform with the general rate of assessment on real property in that borough, but this was by reason of an express finding made by the court that the assessed value of the relator's property was less than its true value, even when reduced so as to accord with the prevailing rate of assessment. In the absence of such a finding, it must be assumed that the state board assessed the relator's property at its full value — a presumption which the evidence in this case fully supports, and the relator was entitled to the reduction.
The orders of the Special Term and Appellate Division must be reversed, without costs in this court to either party, and the proceedings remitted to the Special Term for further hearing and disposition in accordance with this opinion.