not evade the obligation imposed upon him by his contract and the decree of the court by incurring new ones.

The order should be reversed, with $10 costs and disbursements to the plaintiff, and the motion denied, with $10 costs and disbursements on the motion to the plaintiff. All concur.

---

PEOPLE ex rel. NEW YORK CENT. & H. R. R. CO. v. PRIEST et al., State Board of Tax Com'rs (CITY OF NEW YORK, Intervener).

(Supreme Court, Appellate Division, Third Department. March 6, 1912.)

1. TAXATION (§ 144*)—RAILROADS—SPECIAL FRANCHISE.

A street was laid out on the maps of a city as a public street in 1811, but was not opened and worked as a street until 1850, although parts of it had been used for public travel before that time. In the meantime, pursuant to an act of the Legislature, a railroad had been constructed within the bounds of that street as so laid out. Under that act, the railroad was required to and did obtain the consent of the city to the use of the street. Part of the land used by the railroad was owned by the city in fee, subject to the use of the public as a highway, and part by other parties, who conveyed it to the railroad. *Held*, that the right to use the street by the railroad was taxable as a special franchise, notwithstanding it was used by the railroad before it was actually used as a street.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 250, 251, 258½–263; Dec. Dig. § 144.*]

2. RAILROADS (§ 75*)—USE OF STREETS—ESTOPPEL.

A railroad company, after obtaining permission from a city to use a street, cannot attack the validity of the act under which the street was laid out, on the ground that it provided that no compensation should be paid for buildings erected after it was laid out and before it was actually opened for the purpose of showing that the place in question was not a street at the time it constructed its railroad.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 183–191; Dec. Dig. § 75.*]

3. TAXATION (§ 496*)—ASSESSMENT—ATTACK—BURDEN.

The burden is on the party attacking an assessment of a special franchise by the State Board of Tax Commissioners to show that a wrong method was adopted, or a proper method erroneously applied.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 890–910; Dec. Dig. § 496.*]

4. TAXATION (§ 376*)—ASSESSMENT—METHOD OF ASCERTAINING VALUE.

A State Board of Tax Commissioners in assessing special franchises must ascertain the actual value, and, in arriving at this value, are not bound to adopt any particular method.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

Appeals from Special Term, Albany County.

Certiorari by the People, on relation of the New York Central & Hudson River Railroad Company, against George E. Priest and others, constituting the State Board of Tax Commissioners, the City of New York intervening as defendant. From an order modifying and affirming the assessment of the franchise tax of the relator for the

year 1900 on its railroad in Park avenue, New York City, the relator and the City of New York bring cross-appeals. Affirmed.

See, also, 124 N. Y. Supp. 276.

Argued before SMITH, P. J., and KELLOGG, HOUGHTON, and BETTS, JJ.

Ira A. Place (Alexander S. Lyman, of counsel), for relator.

Thomas Carmody, Atty. Gen., for State Board of Tax Com'rs.

Archibald R. Watson, Corp. Counsel (Curtis A. Peters, of counsel), for City of New York.

JOHN M. KELLOGG, J. [1] The relator contends that its lessor had a right of way 24 feet wide through Park avenue prior to the use or opening of such avenue as a public street, and that, therefore, no franchise tax can be assessed thereon under People ex rel. N. Y. C. & H. R. R. Co. v. Woodbury et al., 203 N. Y. 167, 96 N. E. 431.

Chapter 263 of the Laws of 1831, incorporating the New York & Harlem Railroad Company, relator's lessor, gave it the right to construct and operate a single or double track railroad from the north bounds of Twenty-Third street to the Harlem River between the east bounds of Third avenue and the west bounds of Eighth avenue. It was to make and file in the register's office a survey and map within two years and within four years construct its road, which map was not to be filed until approved by the common council of the city declaring that it approved of the map and the route indicated therein, and it was authorized to enter upon and take possession of lands for that purpose, which lands it might acquire by gift or purchase, or by condemnation in case of an inability to agree with an owner. Section 10 provided that, in case the route was located in or along any street or avenue now laid out on the map or plan of the city, sufficient space must be left in the street or avenue on each side of the railroad for a public highway for carriages and sidewalks for foot passengers. Section 11 provided that, when necessary, it should be lawful, with the consent of the mayor, aldermen, and commonalty of the city, to intersect or cross any stream of water, or water course, or any road, street, or highway, provided that it restore the stream, water course, road, street, or highway thus intersected to its former state, or in a sufficient manner not to have impaired its usefulness, and shall, moreover, erect and maintain sufficient fences along the line of the road. Section 16 provided that nothing in the act should be deemed to authorize the corporation to construct or use its railroad across or along any of the streets or avenues of the city, as designated on the map of the city—

"whether such streets or avenues shall have been opened or not, without the consent of the mayor, aldermen and commonalty of the said city, who are hereby authorized to grant permission to the said corporation to construct their said railroad or way across or along said streets or avenues, or prohibit them from constructing the same, and after the same shall be constructed to regulate the time and manner of using the same and the speed with which carriages shall be permitted to move on the same or any part thereof."

The maps were duly filed, approved of by the common council, and the consents mentioned in section 16 were applied for and obtained and the road constructed as a double track road within the time limit.

Fourth, now Park, avenue, was laid out on the maps of the city as a public street in 1811, pursuant to chapter 115 of the Laws of 1807. That act provided that after the map was filed showing the location of the street that no compensation was to be allowed for any building that might be built or placed in whole or in part on the property laid out as a street after the filing of said map. The several statutes relating to the city were compiled in chapter 86 of the Revised Laws of 1813, and by section 177 a mode of procedure was provided for opening the streets laid out on the map and vesting the title thereto in the city. Section 178 substantially repeated the declaration that no compensation should be allowed for buildings constructed within the line of the street as shown upon the map. The street was never opened and worked as a public street until 1850, at which time the railroad company was in operation. The evidence indicates that parts of the street were used more or less for public travel before the railroad came, but manifestly the greater part had not been so used. Park avenue, from Forty-Second to Eighty-Fourth street, passed through the common lands owned by the city of New York. In 1794 the unsold common lands were directed to be sold and a map of them was made, with the east road 60 feet wide running through them from north to south,. which road is now substantially embraced in Park avenue. The maps show the lots as fronting on this road, and many of them were sold, the boundary carrying them to the road. The making and filing of the map and selling of the lots according to it bounded on the road dedicated the road as a public highway, so that as to the unsold lands the city owned them in its private capacity, but subject to the use of east road by the public as a highway. As to the sold lots, it owned the fee of the street fronting them subject to use as a public street. Graham v. Stern, 168 N. Y. 517, 61 N. E. 891, 85 Am. St. Rep. 694.

The relator shows conveyances from many of the lot owners of the 24-foot strip in Park avenue in various places from 45th to 133d street. The grantors of the relator, however, in many of the cases had laid out their lots as fronting upon the avenue, had sold lots bounded thereon, and had deeded the street itself to the city for street purposes. In some instances there had been no deed to the city. The relator, therefore, has the right to occupy the 24 feet in Park avenue over the common land by the express permit of the city, the owner of the fee, except as to the parcels which the city had previously sold; the other lands by the consent of the city as provided by the act of incorporation of the relator and by a conveyance of the property in cases where the city had not acquired title to the street itself. Both the relator and the city are statutory persons, deriving life and power from the Legislature, the relator its right to maintain its road in the street by the act of 1831, and the permission of the city given pursuant to that act. The act prescribed as a condition of the right to occupy Park avenue the consent of the city, and that the

railway must so occupy the street that it should remain available for street purposes and its use should be regulated by the city. The law under which Fourth avenue was laid out expressly provided that no compensation should be allowed a property owner for buildings erected within the line of the street ·after the street was mapped. The rela-·tor is not in a position to claim that the rights of the city in the street as a street accrued to it after the relator was established there. The act of incorporation does not permit the company to say that as between it and the city, with reference to its right to occupy the streets, that the rights of the city were not the same with reference to it as if the street had been actually laid out and worked upon the ground. It cannot characterize the avenue as a paper street. It was required to get the same permission to occupy it, and practically under the same terms as if it were actually opened and used, and, when it put .its tracks in the avenue, it did it subject to the rights of the city to use and occupy it as a street. And this statutory person cannot be heard to say that the rights and obligations which were put upon it by the statute are not binding upon it. When it acquired its rights and laid its track with the consent of the city, it knew and practically assented that the building of its tracks could not prejudice the city when it desired to use the street for street purposes.

[2] We need not consider how far an individual could question the validity of the statute, saying that no compensation should be allowed to the property owners for structures thereafter .erected. When the relator applied for and obtained authority to occupy this street, it is beyond its right to question the validity of the act under which the street was created or the conditions attached to the laying out of the street. It, in substance, consented to take its rights subject to the rights of the city and public in the street as contemplated by the statute.

I think, therefore, that for all practical purposes between the parties the relator cannot be heard to say that in working the street the city obtained rights from the company, and that the company was occupying the ground before a street was laid there. The Legislature permitted the railroad to occupy this street if the city consented to it, and granted it the right. It is therefore occupying the street by virtue of the consent of the city, and its rights therein are taxable as a special franchise. Aside from the consent of the local authorities, it was a trespasser in the avenue. As the relator's right in the street came from the consent and permission of the city, the lapse of time does not create an adverse user which prejudices or destroys the city's rights. The company held all the while under the city. The act of · incorporation reserved the right at any time to amend, alter, modify, or repeal it, and various amendatory statutes have since been passed which it is unnecessary to refer to, which indicate clearly that the company is and has been occupying this avenue as a special franchise in a public street.

[3, 4] The commissioners, it is said, do not show the exact basis upon which they computed the value of the intangible part of the franchise. The burden, however, rests upon the relator to satisfac-

torily show that a wrong system has been adopted, or that a proper system has been erroneously applied. There is no hard and fast rule by which the value of every special franchise may be determined. In some cases the net earnings rule is the proper measure; in other cases it would be entirely improper. The assessors are to ascertain the real value and may avail themselves of all tests within their reach and all information which in their judgment bears upon the value. People ex rel. Jamaica Waterworks Co. v. Tax Com'rs, 196 N. Y. 39, 89 N. E. 581. The net earnings rule, in ordinary cases, may be considered the best method. People ex rel. Hudson & Manhattan R. Co. v. Tax Com'rs, 203 N. Y. 119, 131, 96 N. E. 435. There are great difficulties in applying that rule to this case. In a large system like the relator's it is impossible to tell what the earnings of this particular part of its road is. It connects its terminals in the heart of New York City with its road extending for thousands of miles through the country in nearly every direction. It is located in a thickly settled part of the city. Manifestly the per mile earnings would not be a proper measure of value, as it is apparent that the right to use this avenue in this great city must be more valuable than the right to use an equal mileage over an ordinary highway in some obscure part of the country. The situation of the road, the condition of the street, the business passing over it, the advantage to the company, the detriment to the public, its particular locality, and many circumstances may properly be taken into consideration in determining the value. There is nothing in the record that indicates that the valuation is excessive.

The assessors fix the valuation at $10,192,000, and do not otherwise state its value. It must therefore be assumed for the purposes of this case that the amount stated was the actual value of the property. People ex rel. Manhattan R. R. Co. v. Woodbury, 203 N. Y. 231, 96 N. E. 420. The court was right in reducing the assessment to equalize it with assessments of other property. People ex rel. Hudson & M. R. Co. v. Board of Tax Com'rs, 96 N. E. 435 (Court of Appeals, October 3, 1911), not officially reported. We have examined the records and maps carefully, and, while we have not stated in detail the various statutes, conveyances, and the sources from which the parties derive their interests in each instance, due consideration has been given thereto and to the various points raised upon the argument, and we find no substantial error to the prejudice of either party.

The order appealed from is therefore affirmed, without costs. All concur.