John P. Cohalan, Jr., J.
In this tax certiorari proceeding petitioner Tilsac has attacked its assessment for the tax years 1963-1964 and 196L-1965 on the double grounds of inequality and overvaluation.
The subject real property, known as 1 The Big H ’ shopping center is situate on New York Avenue, at Huntington, in Suffolk County. It occupies approximately 25 acres, seven of which are unimproved. The latter are separated from the improved portion by a Sears Roebuck store not privy to this proceeding.
*432 For each of the two years under review the assessment is: Land $75,300. Total $586,800.
The rate of assessment is 17%, which is also the State equalization rate for the Town of Huntington. This, therefore, imports a full value to petitioner’s property of $3,450,000 (rounded).
It is axiomatic that a tax assessment is presumed to be correct (Matter of Melcroft Corp., 256 App. Div. 291) and that the burden of showing an assessment to be erroneous or illegal is upon the petitioner (People ex rel. New York Cent. & Hudson Riv. R.R. Co. v. Priest, 150 App. Div. 19, affd. 206 N. Y. 274; Matter of Putnam Theatrical Corp. 16 A D 2d 413 [1962]).
As a preliminary step petitioner made a demand pursuant to subdivision 1 of section 716 of the Real Property Tax Law that respondents admit for the purpose of this proceeding that the percentage of full value at which other real property is assessed is 14%%. The demand was refused.
On the issue of inequality the parties failed to agree on the parcels to be appraised. Thereupon, on petition, the court in obedience to subdivision 3 of section 720 selected 16 parcels to be appraised “ without reference to their assessed valuations ” from separate lists of 25 parcels submitted by each of the litigants. Eight were selected from each list.
As might be expected the parcels culled from the petitioners’ list averaged well below the equalization rate of an assessment ratio of 9,54% to appraised value; those of the respondents well above, to 23.65%. During the trial several mistakes respecting petitioner’s parcels were uncovered. An analysis of the 16 parcels after correction revealed, however, that as to 7 of the town’s 8 selections and as to 4 of Tilsac’s 8, the parties agreed on valuation As to these the ratio of assessment to appraised (full) value was 23.19%. And finally, after halving the difference between the parties’ appraisals as to the disputed items, these figures reveal that as to all 16 parcels the over-all ratio was 22.43%.
In People ex rel. Hagy v. Lewis (280 N. Y. 184) (a parcel selection appraisal case) 12 items were submitted to the lower court. The ratio of assessment to full value ran from a low of 33%% to a high of 114 12/25%. As to this disparity the Court of Appeals said (p. 188): “When the parties agree on the parcels to be valued it is to be presumed that inordinate diversities have been excluded. In the absence of such agreement the selection is made by the court * * * and then (unless the contrary be shown) it is to be presumed that judicial fair *433 ness is a guaranty that the parcels chosen also fairly exhibit a cross-section of the situation that exists throughout a tax district. Thus the idea of the statute appears to be that a sufficiently approximate arithmetical mean can be established by pooling a number of parcels (so selected) and comparing the aggregate of their assessed valuations with the aggregate of their full values. Apparently this was the view of the courts below. We cannot say that such a process is inadequate for practical attainment of the rough equality which is all that has heretofore been possible under any system of taxation. * * * As we all know, there are in almost every community peculiar standards of value indigenous to particular locations ”.
On the issue of inequality Tilsac availed itself of that part of subdivision 3 of section 720 which reads that: “ the parties shall be limited in their proof on the trial of such issue to such [appraised] parcels * * * except that evidence may be given by either party as to (1) actual sales of real property within the assessing unit that occurred during the year in which the assessment under review was made ’ ’.
The parties stipulated that as far as the ratio portion of this case is concerned the court’s determination as to the 1963 ratio will determine that of 1964 as well, but did not make the same stipulation as to value. An accord was reached, also, on the question of value as imported by documentary stamps on deeds. Based on 55 cents for each $500 (or fraction thereof) of sale price, it was agreed that the apparent price so shown would be reduced by $250 in each instance. In so stipulating, the town did not for one moment agree that the total of the stamps shown was in any manner a true indication of the actual sale price.
The greater part of the evidence adduced by Tilsac dwelt on the statute subdivision recited above. The statistics introduced as background material either at the trial itself or on motions of a preliminary nature disclosed that in the years under review Huntington had a total population of about 150,000 and that in 1960 (latest available statistics) there were 47,117 real property units of all types and descriptions on the town tax roll.
In the calendar year 1963, 6,649 deeds were recorded with a total of 10,191 grantors listed.
In what was described as a random sampling procedure, Tilsac produced figures from the County Clerk’s records concerning about 1,800 of the total sales. After a great deal of evidence from both sides as to the tona fides of the sales and the accuracy of the figures, a hard-core remainder of several hundred undisputed items resulted. Undisputed, that is, only in the sense *434 that respondents made no direct attack on the items remaining, maintaining, however, the over-all objection that the procedure itself was improper and inconclusive.
As to the hard-core remainder the ratio of current assessment to sales price on a dollar wise basis came out to 12.85% and to 13.35% on an average of ratio basis.
There was a wide disparity between the high and low assessments so produced. In the first batch of 900 (uncorrected) 622 items showed a ratio of assessment to sales of 16% or less; 194 were above 17% and the remainder (84) were over 16% and under 17%. Of the first 900 so totaled only 16 sales were for, a purchase price of more than $50,000. The second batch produced somewhat similar results.
The reason the court segregated sales indicating an assessment/price ratio of over 16 % and less than 17 % lies in the circumstance that in the applications for correction of assessed valuation of real estate (protests) lodged with the town for the two years under review Tilsac claimed its assessment should be $277,400 based on an actual land and improvement cost to it of its real property of $1,722,000. This works out to be an assessment of 16.11%. In the same two protests petitioner considered its property to be worth $1,660,000 with the same proposed assessment, which would result in a ratio of 16.7%. The amount of fire insurance carried was said in the protests to be $3,000,000.
In passing the court expresses its mystification at the figures furnished to the town authorities, for Tilsac’s own books of account disclose a total initial cost for land and improvement of $3,800,337.25 for its real property which was acquired as vacant land in 1959 for $413,192.74 and not fully improved until well into the year 1963. This development the court construes to be an admission against interest.
The then Town Assessor was called upon to testify as to his modus operandi in arriving at assessments. He explained that inasmuch as June 1 of each year is the cut-off date for determining taxable status (Suffolk County Tax Act, § 5; L. 1920, ch. 311, as amd.) every effort is made prior to that date to bring in more tax revenue by adding partial improvement assessments to the tax roll, (a laudable objective).
To this end and with the permits issued by the Building Department as a guide, he and his staff would continue to make inspections throughout the town as close to the deadline as possible. He then fixed a more or less arbitrary figure (he called it a flat assessment) on foundations and on rough unfinished *435 structural work which may or may not have worked out to the 17% formula.
As to finished products it was his custom (and allegedly good assessment procedure) to use three criteria for assessments. These were (1) the State equalization rate, (2) the value of adjoining or comparable properties, and (3) replacement costs less depreciation. If he could not fit the property comfortably into this tri-partite Procrustean bed, then he would cut the body accordingly by giving weight to two of the three indicated criteria.
Obviously, with his limited staff, it was a physical impossibility to do more than drive by the long-established neighborhoods to view long improved properties; hence, in the absence of a complete review such assessments were carried from year to year without change.
From his explanation it would follow that if a person starts upon the construction of a residence after June 1 of any given year he may be enjoying the full fruits of his home by October 15, although his assessment will continue as if the property was still unimproved, until the following year, for an over-all period of some 15 months. Thus, a sale during the lag period would produce a realistic purchase price and a most unrealistic assessment.
Applying this to the sales data produced as a result of this random sampling, there are instances where the real property, from the figures presented, is assessed at much less than 10% of the sales price. But the vexing factor is that the court was not advised of the nature of any given sale. Thus a 100-acre farm, as farmland, will be assessed as acreage at a much lower amount than would the same farm broken down into building plots and filed as a map for development purposes. So that the mere indication by documentary stamps in an exhibit that the purchase price of a parcel was $200,000 and the assessment only $5,000 (a 2%% rate) is not too helpful to the court. Nor is it necessarily an indication that the assessor had erred in fixing the original assessment.
The example used immediately above merely calls attention to the existing state of facts in western Suffolk County wherein a population explosion is in progress and more and more large tracts of land are being subdivided for the erection of one- and two-family residences and of business structures to service the increase. It bears out, also, the contention expressed by Bonbright in “ Valuation of Property ” (p. 500) that “ uniformity *436 does not require anything more than the treatment alike of things that are alike ’
As between actual sales and the appraisal selection system seemingly preferred by the Legislature, one advantage of the latter is that the court hears testimony in depth, whereas in the sales approach, extensive as it may be in the number of samplings made, no details of the real property or of the sales transactions are made available to the court.
This thought is expressed in Matter of Seneca Hotel Corp. v. Chacchia (13 A D 2d 896 [4th Dept.], affd, 10 N Y 2d 1031): ‘1 While evidence of sales of parcels other than those on a selected list may be considered, we believe that, under the circumstances of this case, the Referee properly gave greater weight to the expert valuations of the selected parcels. Therefore, the ratio he arrived at should be accepted ”.
In People ex rel. Yaras v. Kinnaw (303 N. Y. 224) (also relied upon by Tilsac), there was no random sampling as such, but merely planned selection by the contending parties of actual sales which occurred during the period under review. As to this, the court stated (p. 233): “ This line of evidence — and it is entitled to substantial weight under section 293 [now 720] would indicate a ratio of 61.5 % ’ ’.
As to the weight to be given to actual sales developed by random sampling, petitioner leans rather heavily for aid and comfort on Matter of Mid-Island Shopping Plaza v. Podeyn (25 Misc 2d 972 [1961], affd. 14 A D 2d 571, affd. 10 N Y 2d 966). There the trial court conducted a tax certiorari proceeding based in large part on stipulation. No parcels were selected for appraisal by either side. Petitioner proceeded solely on the actual sales in the tax years under review. The sales selection was done by random sampling as in the case at bar.
In effect the respondent in Mid-Island (supra) stood mute because no attack was made upon the sales information abstracted from the deeds on record, although the right to do so had been reserved.
In speaking of the random sampling method employed in Mid-Island, it was noted in Special Term’s decision (p. 978) that: ‘ ‘ The court has given much consideration to this relatively new method of ascertaining ratio and has found no valid reason why it should not be given substantial weight when properly applied. Certainly in this case, where the respondents have offered absolutely no evidence to discredit it, nor proof of any other nature to establish a different ratio, it is entitled to acceptance ’ ’.
Herein we ask ourselves if the method was properly applied or was it at least in part, discredited?
*437 In the instant case, respondent entered into no stipulation as to the use of the sales during the years under review except as before noted with respect to ratio. Rather, it fought the system tooth and nail, fang and claw. It alleged that the entire sampling method proceeded on a false theory of randomness and was suspect; that the record of the sales presented was replete with errors as to assessments, prices and duplications; and that no attempt had been made to produce sales, if any were made, of commercial properties valued at more than $50,000, into which tax category petitioner falls.
To quote Mid-Island again, as noted by the court (p. 977): ‘ ‘ every sale in the county during the year, in which the consideration was reported in a publication known as ‘ Nassau Realty Statistics ’ to be $75,000 or more was examined. Approximately 190 sales in this latter group were included in the tabulation ’ \
In the two 900 sales samplings, submitted by Tilsac, only 35 items represented sales of more than $50,000, the largest being for $477,000. No information was vouchsafed to the court as to the nature of any of these items, some of which in Huntington might well have been farm acreage sold for development purposes.
Thus, persuasive as the random sampling technique appeared at first blush, the vigorous attack upon it by respondent has diluted its effect to a considerable, if not fatal, extent.
As it was entitled by chapter 942 of the Laws of 1961, amending subdivision 3 of section 720, Tilsac produced records of the State Equalization Board to prove the 17% rate for the town. The years covered by the review establishing this figure were 1959 and 1961. By exhibits received in evidence Tilsac showed that certain categories of structures were excluded from the State survey, and argues from that that it was not a fair indicator of the equalization climate of the town.
But the random sampling here is subject to the same criticism, for not one of the 1,800 odd sales produced has been identified in any way as a shopping center or as a large commercial venture. And even in the Mid-Island case (supra) with all the stipulations that were entered into by respondents, this feature was deemed of importance in the assessment scheme of things.
Anyone with half an eye knows that the value of real estate in the western part of Suffolk County increased generally between 1959 and 1963, and indeed between 1961 and 1963; and that many assessments have not kept pace with the enhancement. But here, at best, we have only several hundred parcels exposed for review of units now in the approximate aggregate of 55,000. While it is concededly impracticable and well nigh impossible for either *438 side to go over each unit in the town, the sampling method used was proved too replete with errors to accept it at face value.
Two specific examples will demonstrate that random sampling did not prove out on a fair analysis. The second list of 900 sales recorded in 1963 (uncorrected) on petitioner’s Exhibit No. 40 are listed numerically. Item No. 839 gives a sale price on a deed dated December 6,1963 of $21,750 against an assessment of $90, a ratio of 41/100ths of 1%. Item No. 888 shows $125 over $24,250 on a deed dated November 1, 1963, a ratio of 52/100ths of 1%. The justifiable — the inescapable inference is that the houses were built and sold after the June 1 cut-off date carrying a negligible assessment for what was then vacant land.
Referring again to Exhibit No. 40 (uncorrected), where the assessments shown are less than $1,000, the court considered the property to be assessed either as vacant or only partially improved land. Of the 900 items 164 were in this category, including items No. 839 and No. 888.
On a dollar value the assessed ratio was 4%, and on an average of ratio, 6.86%. While we are told that all properties should be assessed at a uniform rate (Real Property Tax Law, § 306; People ex rel. Parklin Operating Corp. v. Miller, 287 N. Y. 126), it is apparent that in Huntington, the rule is more honored in the breach than in the observance. Nevertheless, such a circumstance throws the random sampling statistics out of kilter for the obvious reason that almost 20% of one sampling is of property not of the same or similar nature as the subject property.
Petitioner itself recognized this lack of homogeneity. In an affidavit submitted in support of the parcel selection, its attorney stated: ‘ ‘ Since it is universally recognized, although not constitutionally conceded, that properties used for different purposes are often assessed differently, the existence of these diverse uses increases the difficulty of sampling the Huntington assessment roll ’ ’.
Thus, absent the homogeneity, we are placed in the position of a man adding apples and peaches together to arrive at a total of oranges.
Skyline Woods, a residential community, is adjacent to the subject property. It was carved out of the same original land acquisition and was developed at about the same time as the Big H. Being aware of this, the court looked for and found sales listings, five in number, on Exhibit No. 40. They are items 145, 148, 191, 244 and 440. All are improved properties. They show an aggregate assessment of $19,925 and a total sales price of $112,450. This works out to an assessment of 17 7/10% with respect both to dollar value and average qf ratios.
*439 This is some indication that on the argument of inequality no discrimination was practiced against the Big H.
The coup de grace to random sampling — so far as it pertains to this proceeding — came from one of the statisticians called by petitioner. He was under the impression that there were approximately 10,000 sales in 1963, rather than 6,649.
Bearing in mind that respondents had attacked the very premise upon which the theory was postulated, namely, that the sampling was a true index of the ratio of assessments to value in the town, the following is illuminating:
On cross-examination by respondents the transcript shows:
“ Q. Did I hear you correctly say that the conclusion you reached after the study was a conclusion which would reflect the actual ratio of the entire tax roll of the Town of Huntington? “ A. I don’t believe I said that.
“ Q. Well, what did you say? “ A. I believe I said it would reflect the entire tax roll of the Town of Huntington to the extent that the sales in 1963 represent the entire tax roll of the Town of Huntington.
“ Q. All right. Now, do you know whether the sales of 1963 represent the entire tax roll? “ A. No, I do not.
“ Q. Assuming there were 55,000 parcels on the tax roll in 1963, and assuming that you sampled 900 sales which took place in 1963, can you now tell me whether those 900 sales are a reflection of the actual tax roll for the Town of Huntington in 1963 ? “A. I cannot.”
The question of inequality can best be summed up by quoting from Matter of Wolf v. Town of Hanover (308 N. Y. 416, 421-422): “ The reason why a mere comparison of the assessment of a neighbor’s property is irrelevant, and why the question is solely one of comparative rate of assessment, is evident when the purpose of an inequality proceeding is borne in mind. This court long ago held that the injustice to be redressed in such a proceeding is discriminatory assessing which has the effect of compelling the taxpayer to pay more than his due share of the aggregate tax, that is, the levy on all the taxpayers in the entire district. (See People ex rel. Delaware & Hudson Canal Co. v. Ganley, 131 N. Y. 566; People ex rel. Warren v. Carter, supra, 109 N. Y. 576.) But that grievance may not be established simply by showing an underassessment of neighbor A’s property. As Judge Andrews, writing for the court in the Warren case, put it, ‘ if a particular piece of property [e.g., neighbor A’s] on an assessment-roll is undervalued, another [e.g., neighbor B’s] may be correspondingly over-valued’ (109 N. Y. at pp. 580-581). In such circumstances, the subject property would *440 be bearing no greater than its due proportionate share of the total tax burden, and, as indicated, the petitioner would have no cause or basis for complaint.”
Here, in the court’s opinion, the petitioner has not overcome the presumption of correctness; and has not successfully carried the burden of showing an illegal or erroneous assessment on the ground of inequality.
OVERVALUATION
In People ex rel. Yaras v. Kinnaw (303 N. Y. 224, 229, supra) the court observed that: “ In overvaluation cases, the only pertinent assessment is that of the subject parcel; assessments of other parcels are irrelevant to overvaluation and so are the statutory procedures relating to the assessment ratios in the sample parcels and in the sales of other parcels.”
As already indicated the acquisition cost of the land to Tilsac was $413,000 (rounded). The total cost of construction as of June 30,1963 (including land acquisition) was $3,737,990.23. As of a year later the figure had risen slightly, to $3,800,337.25. These figures were taken from Tilsac’s records.
“ It is a cardinal rule * * * that whatever property is worth for the purposes of income and sale it is also worth for purpose of taxation.” (Adams Express Co. v. Ohio, 166 U. S. 185, 220.) And, commenting on market value in a deficiency judgment situation under section 1083-a of the Civil Practice Act, our Court of Appeals, in Heiman v. Bishop (272 N. Y. 83, 88) noted: “ The court should receive evidence of the age and construction of the buildings on the premises, the rent received therefor, [assessed value], location, condition of repair, [the sale price of property of a similar nature in the neighborhood], conditions in the neighborhood which affect the value of property therein, accessibility and of all other elements which may be fairly considered as affecting the market value of real property in a given neighborhood. With such evidence before it, the trial court, in the exercise of its best judgment, should determine the market value of the premises in the existing circumstances.” (Brackets added.)
Except for “ assessed value ”, the instant issue and the “sale price of property of a similar nature in the neighborhood ”, interdicted by the Yaras case (supra), the other items have received consideration from the court and will be discussed in due course below.
The premises are on the west side of New York Avenue (State Route No. 110), on the north-south main traffic artery, and on the south side of Semon Road (a local street).
*441 Accessibility is afforded by such main east-west arteries as State Routes 25 (Jericho Turnpike) and 25-A, and the Long Island Expressway and Northern State Parkway. More remotely, Southern State Parkway and Sunrise and Montauk Highways furnish ready approach. Many local streets funnel into New York Avenue (State Route No. 110) and make for easy accessibility to the property.
As a new building its condition of repair is presumably as good as it ever will be, short of a complete renovation at some undetermined future date.
An upcoming urban renewal project is cheek by jowl with the Big H. A long blighted area will be replaced by apartments that will house a new source of potential customers.
Two separate one-story buildings composed of brick siding, glazed brick and ceramic tile front, with aluminum casement plate glass windows and doors and a flat composition roof, comprise the improvements The theatre and one of the stores have mezzanines and one store has a second floor.
The two units are set at right angles to each other, forming an L. There is a total of 30 stores, 16 in Hnit No. 1 and 14 in the other. The tenants include a bank, a theatre, a restaurant, some chain stores and various small dependents.
Each side produced an expert to give his opinion as to fair market value as of June 1,1963 and June 1,1964.
Tilsac’s expert disparaged three of the four standard types of valuation in his approach. In his report in evidence he said that: “ No buyer will have his final figure in comparison, summation or cost approach. His interest is only in the income stream. (Italics in report.) Not what was paid for the land or what the construction cost of improvements might have been. His interest is in how much is left over after paying operating expenses given the quality and quantity of the income stream ”.
He proceeded to arrive at a “ fair market value ” of $2,824,000 for 1963, and $2,449,000 for 1964, whereas the town’s expert came up with $3,840,000 and $3,900,000 respectively.
Let us examine their contentions.
For the first year Tilsac’s expert showed an “ effective gross income ” of $485,336, which is reduced by expenses of $51,220 and real estate taxes of $132,804, to a net of $301,312. He capitalized this at 10.67% and arrived at his values. For the following year he showed an “effective gross income” of $456,693 and expenses and taxes totalling $195,421, leaving a net of $261,272, which capitalized in the same fashion, produced the value shown above.
*442 Using the 17% rate of assessment on these figures the respective results would be $480,080 and $416,330 as against the current assessment of $586,800.
From the same arithmetical source, i.e., Tilsac’s records, the town’s expert arrived at a net income of $332,000 and $338,500 for the two years at issue, as a basis for arriving at his valuations.
As noted, Tilsac’s witness used a capitalization rate of 10.67%.
He broke it down as follows:
1. Safe interest rate................... 4.00%
2. Nonliquidity ....................... 2.00
3. Bisk rate .......................... 1.50
4. Management........................50
*5. Depreciation ....................... 2.67
Total ..................... 10.67
The court agrees with (1), (4) and (5). In view, however, of the testimony that Tilsac was able to raise an additional $500,000 from a source other than its mortgagee in what is concededly a rather complicated transaction, the court has cut the nonliquidity factor in half. The risk rate has been reduced (by two thirds) for the reason that most of the tenants are high grade in nature and their leases are of comparatively long duration. Thus, the 10.67% is reduced to 8.67%.
With this reduced rate in use the fair market value under this approach would be $3,475,000 for the first year and $3,013,500 (both rounded) for the second.
Besides using the capitalization approach, respondent’s expert pointed out that he also gave consideration to the cost of reproduction less depreciation in his appraisal.
This view is supported in Matter of 860 Fifth Ave. Corp. v. Tax Comm. of City of N. Y. (8 N Y 2d 29). At page 32, Vast Vooehis, J., writing for an unanimous court, observed that: “ Cost of new buildings or reproduction cost less depreciation establish maximum building value in assessment cases (People ex rel. Manhattan Sq. Beresford v. Sexton, 284 N. Y. 145; People ex rel. Parklin Operating Corp. v. Miller, 287 N. Y. 126, 130; People ex rel. Hotel Paramount Corp., v. Chambers, 298 N. Y. 372, 375; Matter of Sample School for Girls v. Boyland, 308 N. Y. 382). It can have no other relevance unless the building would normally be reproduced at the time in question. One may *443 regard that formula as supplying some evidence of value, however, where, as here, the building is well suited to the site. The actual construction cost in 1949-1950 was properly considered as a factor. The tax years now in litigation followed soon after the construction of this building, and both the assessors and Special Term found the same building value as well as the same land value during each of the tax years in suit.”
An exhibit received in evidence without objection or attempted contradiction shows — by a licensed professional engineer — reproduction cost less depreciation to be (1) as of June 1,1963, $3,481,566; and (2) as of June 1,1964, $3,575,570.
Aware as the court is that a mortgage on real property is of no concern to an assessor, it cannot close its eyes completely to the factual circumstances here presented as they bear on market value.
A local bank lent $2,900,000 on a building loan. Later, the mortgage was assigned to a life insurance company. It was increased by an additional loan which was consolidated into a first mortgage of $3,200,000. Surely this imparts a value of at least that amount. And if we assume a lending limit of 80% of value, the property was valued at $4,000,000.
No one questioned that the highest and best use of the land is that to which it has been devoted.
The court concludes that the petitioner has not overcome the presumption of correctness of the assessment nor has it borne the burden of showing the assessments to be erroneous or illegal.
The figures arrived at by the assessor may remain undisturbed. The petition is dismissed, without costs or disbursements.

 Arrived at by figuring land value at acquisition to be 11% of total cost and improvements 89%; and by providing for depreciation at an annual rate of 3% for 33 years).