[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 277 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 279 
The relator is a domestic corporation, and a lessee from the New York and Harlem Railroad Company, a domestic railroad corporation, of a line of railroad extending from 42nd street in the city and state of New York, to and beyond the Harlem river. By the terms of said lease the relator contracted to pay all taxes and assessments made, levied or imposed upon any of the property or franchises of said Harlem company.
In March, 1900, the state board of tax commissioners made an assessment upon an alleged special franchise constructed, maintained or operated by said Harlem company, and fixed the total valuation thereof in the borough of Manhattan, city of New York at the sum of $12,192,000.
On April 28, 1900, said tax commissioners, after a hearing as provided by statute, gave notice that they had filed with the department of taxes in the city of New York a statement of the valuation of said special franchise in said borough of Manhattan at the sum of $10,192,000.
This proceeding was commenced by petition which alleged among other things: 1. That the assessment is illegal, because said board had no jurisdiction or authority to make it. 2. That the assessment is illegal, because that part of the railroad of said Harlem company assessed is not "constructed and operated under or by virtue of any franchise, right or permission to construct, maintain, or operate, the same in, under, above, on, or through, any street, highway, or public place." 3. That the assessment is illegal, because the said board is not authorized to assess the franchise of a steam surface railroad company. 4. That the assessment is erroneous by reason of overvaluation, and that the extent of such *Page 280 
overvaluation is $8,364,000. 5. That the assessment is unequal, in that it is made at a higher proportionate valuation than other property in said borough of Manhattan. 6. That the assessment is unequal, in that it is made at a higher proportionate assessment than other special franchises in said borough.
The city of New York was allowed to intervene as a defendant. The issues joined by the parties were referred to a referee to take testimony and report with his opinion thereon, and he, after extended hearings, reported with detailed findings of fact and conclusions of law that the assessment was made within the jurisdiction of the tax board, and that the same was not illegal. He found that the assessment of real property in the county of New York other than special franchises for the year 1900 was sixty-seven per cent of the full value thereof, and that the assessment of the special franchise of said Harlem company should be reduced to the sum of $6,828,640 to correspond with the percentage that the other assessments in said county bore to the true value of the property assessed.
At the Special Term of the Supreme Court when the report of the referee came up for confirmation the court confirmed the report of the referee and adopted the findings and conclusions made by him, and also the rulings made by him upon the proposed findings of fact and conclusions of law submitted to him by the parties to the proceeding. The assessment was reduced to said sum of $6,828,640. An appeal was taken by the relator and by the city of New York to the Appellate Division, where the order of the Special Term was unanimously affirmed. (People ex rel. N.Y.C. H.R.R.R. Co. v. Priest, 150 App. Div. 19.) The relator and the city each appeal to this court.
The assessment of the special franchise is upon the railroad leased by the relator of said Harlem company, including the same as it is upon, under and over a strip of land known as Park avenue (formerly Fourth avenue) *Page 281 
in the borough of Manhattan, city of New York, from the southerly line of 45th street to a point near 133rd street, at which point the railroad turns easterly from Park avenue and crosses property alleged to be owned by the railroad company and therefrom crosses the Harlem river by a bridge. The distance from the south side of 45th street to the said point near 133rd street is 4.44 miles, and throughout all of said distance the railroad company maintains four railroad tracks.
This court held, in People ex rel. N.Y.C. H.R.R.R. Co. v.Woodbury (203 N.Y. 167), that the statutes authorizing the taxation of special franchises apply to steam surface railroads. The unanimous affirmance by the Appellate Division of the Special Term order also removes from our consideration all questions of fact.
The Harlem company was incorporated in 1831, and in and prior to 1837 constructed its railroad to the Harlem river in the center of what was known as Fourth avenue. The avenue was not then in actual use as a public street above 38th street. The rights of the Harlem company acquired at that time, so far as they are now under consideration, were confined to a strip of land twenty-four feet wide in the center of said avenue as then mapped and as subsequently laid out and opened. Fourth avenue, so far as now considered, was formally opened by a proceeding commenced in 1850, and there is no question about its being a public street subsequent to that time. It was so laid out one hundred and forty feet wide. It is now known as Park avenue, although it is referred to indiscriminately either as Fourth or Park avenue.
It is not disputed that the two central tracks of the railroad as now used are on such twenty-four-foot strip, and that the two exterior tracks are outside of such strip and were first laid pursuant to authority granted by chapter 702 of the Laws of 1872. That act expressly authorized the Harlem company "for the purpose of facilitating rapid transit and accommodating local traffic, to lay down *Page 282 
permanently two additional tracks on said avenue, and to make such landings and excavations in said avenue as may be required for such additional tracks, with landings for the entrance and delivery of passengers. * * *" Such grant is clearly a special franchise.
The special franchise as assessed purports to include a right or permission to construct, maintain and operate the four tracks in Park avenue as stated. The most important question for our consideration is whether the two central tracks of the railroad as now used are so used by virtue of a special franchise.
This court, in People ex rel. N.Y.C. H.R.R.R. Co. v.Woodbury (supra, p. 179), considering the object of the Special Franchise Tax Act, say: "The object of the Special Franchise Tax Act is to tax railroad corporations for privileges granted them in the streets which they occupy on their lines of railway and if, after they have their rights of way secured over private land, a public highway is laid across the tracks, while there is a crossing it is not a crossing made by the railroad or through public favor so far as the railroad is concerned. The relator, or one of its predecessors, was given the right to be a corporation, to acquire land and to build its road between certain terminal points. It bought its right of way and built its road accordingly. It needed no special franchise in order to use and enjoy its right of way to the utmost extent possible for railroad purposes. Years afterward a street was run across its tracks and a crossing thus created. Such a crossing, made undersuch circumstances, is not a special franchise within the meaning of the statute, because the railroad was built on its own right of way before the street came into existence and no additional right was granted to the railroad company by the extension of a highway across its tracks."
Although the lands on which the tracks of the Harlem company were laid in and prior to 1837 were not then in actual use for street purposes, the Harlem company took *Page 283 
possession of said lands under peculiar circumstances; and it is necessary to consider the findings of fact which show the intention and purpose of the city in regard to Fourth avenue in making the maps and in the acts, resolutions, proceedings and agreements, hereinafter mentioned, affecting the city and the Harlem company and the occupancy of said avenue, and particularly the intention and purpose of the city in giving, and the company in accepting, the consent and permission to take possession of said avenue and construct its road thereon as also hereinafter stated.
By virtue of the Dongan charter the city of New York in 1686 became the owner of lands known as the "common lands" which included the lands on which Park avenue is situated, from the south line of 45th street to approximately the center of 84th street. The grant was confirmed by the Montgomerie charter in 1730. In 1794 the common council ordered the street committee of said council to have the unsold common lands surveyed. The survey and map were made by Casimir Ph. Goerck. They were dated March 1, 1796, and duly filed. The committee reported to the council that they had the survey made "and that they had had streets regularly laid down upon the said survey." One of the streets so laid out was known as "East Road" and extended from 42nd street to 84th street. It was 60 feet wide and it is found that the westerly side of Fourth avenue before it was made wider in 1837 as hereinafter mentioned, coincided with the westerly side of "East Road." The twenty-four-foot strip of land below 84th street is substantially in what was East road. The city sold lots fronting on East road but in so doing did not, unless so expressly stated, convey to the grantee any part of East road. (Graham v.Stern, 168 N.Y. 517.) In 1807 the city, then rapidly increasing in population, was extending its streets northerly, and it obtained from the legislature an act (Laws 1807, chapter 115), appointing commissioners of streets and roads with authority "to lay out streets, roads and public squares." *Page 284 
They were authorized to make surveys and maps and file the same "in respect to the laying out of streets and roads." It was also therein provided "that it shall not be lawful for the commissioners to allow any sum or compensation whatsoever for any building or buildings that may be built, placed or erected in part or in whole in said streets, roads or public squares after the said maps shall be made and filed." An extensive survey and map was made pursuant to said act laying out the city of New York north of Houston street which was filed in 1811, on which Fourth avenue was shown from a point below 42nd street to the Harlem river. Such survey and map gave direction and plan to the subsequent growth of the city, and the avenues and cross streets shown thereon were adopted and thereafter formally laid out and opened. Between 1811 and 1831 many lots were sold fronting on Fourth avenue as shown on said map. Chapter 323, Laws of 1831, incorporating the Harlem company, was passed prior to the physical opening of Fourth avenue at the points now under consideration, but after the plan for the development of the city had thus been authoritatively made, and in very many ways publicly and privately acted upon. Said act of incorporation provided that the incorporators had power "to construct a single or double railroad or way, from any point on the north bounds of Twenty-third street, to any point on the Harlem river, between the east bounds of the Third avenue and the west bounds of the Eighth avenue."
It also provided that "The said corporation is hereby authorized to construct, erect, build, make and use a single or double railroad or ways, of suitable width and dimensions, to be determined by the said corporation, on the line, course and way, selected or designated by them in manner aforesaid. * * * The said corporation shall not take any lands without the consent of the owner or owners thereof, exceeding forty feet in width from east to west, and shall in case of their locating the route *Page 285 
of the said railroad in or along any public street or avenue nowlaid out on the map or plan of the city of New York, leave sufficient space in the said street or avenue, on each side of the said railroad for a public highway for carriages, and for a sidewalk for foot passengers." (Sec. 10.) "Nothing in this act shall be deemed to authorize the said corporation to construct or use their single or double railroad or way across or along any of the streets or avenues as designated on the map of the city ofNew York, whether such streets or avenues shall have been openedor not, without the consent of the mayor, aldermen and commonalty of said city, who are hereby authorized to grant permission to the said corporation to construct their said railroad or way across or along said streets or avenues, or prohibit them from constructing the same, * * * and nothing in this act contained shall prevent the legislature from granting to any other corporation or persons the right of constructing a railroad or roads parallel with the one herein mentioned, or any part of it, on any lands, street, road or avenue not occupied by the railroad or way hereby authorized, or the right of crossing or intersecting the same at any point or points, without making compensation for injuries sustained thereby." (Sec. 16.)
The intention of the legislature to make the occupation by the company of any street actually opened for public use and also of any prospective street as shown by the "map of the city of New York" dependent upon the consent of the mayor, aldermen and commonalty of said city, is clear by the language used in the act of incorporation. The road could not be located within the boundaries mentioned without using one of the prospective avenues, or crossing the numerous prospective cross-town streets. The Harlem company thereafter prepared a map locating the route of their railroad from the north side of Twenty-third street through the center of Fourth avenue to the Harlem river. *Page 286 
On October 5, 1831, the board of assistant aldermen of said city adopted a resolution which was concurred in by the board of aldermen October 10, 1831, and approved by the mayor October 11, 1831, approving such map so far as it located said route, upon condition that such approval should not be "construed into a consent to the said company to construct the said railroad, but that the said company shall first obtain the consent of the Mayor, Aldermen and Commonalty of the City of New York before they commence the construction of said road."
On December 16, 1831, the board of aldermen adopted a resolution which on December 29, 1831, was approved by the board of assistants, and on December 22, 1831, by the mayor of said city, which permitted said company "to construct and lay down in pursuance of the act of incorporation a double or single track or railroad or railway along the Fourth Avenue from Twenty-third street to the Harlem river in conformity" with said map, "provided that the width of such double railroad or way shall not exceed twenty-four feet."
Said resolution also provided: "And be it further ordained that if, at any time after the construction of the aforesaid railways by the said New York and Harlem Railroad Company, it shall appear to the Mayor, Aldermen and Commonalty of the City of New York that the said railways, or any part thereof, shall constitute an obstruction or impediment to the future regulation of the city, or the ordinary use of any street or avenue (of which the said Mayor, Aldermen and Commonalty shall be the sole judges) the said railroad company, or the directors thereof, shall, on the requisition of the said Mayor, Aldermen and Commonalty, forthwith provide a remedy for the same, satisfactory to the said Mayor, Aldermen and Commonalty; or, if they fail to find such remedy, they shall, within one month after such requisition, proceed to remove such railway, or obstruction or impediment, and to replace the street or *Page 287 
avenue in as good condition as it was before the said railway was laid down; * * *" (Sec. 2.)
It also provided: "And, further, that the said company shall make their railroad path, from time to time, conform to what may hereafter be the regulation of the avenue and road through which said railroad passes." (Sec. 4.)
It also provided that it should not go into effect until said Harlem company should execute an instrument in writing covenanting to stand to, abide by and perform all the conditions and requirements in such resolution contained. On January 9, 1832, the Harlem company executed an agreement with the mayor, aldermen and commonalty of the city as in said resolution provided. At the request of the Harlem company on January 30, 1832, the board of aldermen and also the board of assistants adopted a resolution which was approved by the mayor February 1, 1832, authorizing the Harlem company to take possession of the ground owned by the mayor, aldermen and commonalty of the city over which the road was about to be constructed.
Fourth avenue as shown on said map, filed in 1811, was one hundred feet wide. By authority of chapter 274 of the Laws of 1837 it was made one hundred and forty feet wide by adding twenty feet on each side of the same from Thirty-fourth street to Harlem river.
In or about the year 1850 proceedings were instituted by the mayor, aldermen and commonalty of the city of New York, under a general act passed in 1813 and the laws amendatory thereto, to open as a public street Fourth avenue as such avenue was laid out in 1811 by the commissioner of streets and roads in the city of New York, under the act of 1807, and as increased in width by chapter 274 of the Laws of 1837.
The Harlem company appeared in the proceeding and was awarded nominal damages which were paid to it. Upon the confirmation of the commissioner's report in that *Page 288 
proceeding the city of New York took for street purposes the fee of the lands laid out as Fourth avenue so far as it is now under consideration.
It is asserted and maintained by the city of New York that Fourth avenue was charged with a public interest which antedated the proceeding by it in 1850, and also the incorporation of the Harlem company in 1831, because of the provision in the act of 1807, and also in the general act relating to the city of New York, passed in 1813, under which the proceeding of 1850 was maintained, which directed that it shall not be lawful to allow any sum or compensation whatsoever for any building or buildings that may be built, placed or erected in part or whole upon the streets, roads or public squares shown on the maps therein mentioned if they are built, placed or erected after the said maps are made and filed.
In Forster v. Scott (136 N.Y. 577) this court held that a similar provision in the New York Consolidation Act (Laws of 1882, chapter 410, section 677) imposes a restriction upon the use of the land which amounts to an incumbrance, and that it is unconstitutional. It is a deprivation of property within the meaning of the present Constitution. (Matter of City of NewYork, 196 N.Y. 255.) The Constitution provides that private property shall not be taken for public use without just compensation. (Const. art. 1, sec. 6.)
The express provision against taking private property for public use without just compensation was not in our State Constitution prior to 1821. The contention of the city of New York is that taking private property for public use by a statutory provision prior to 1821 did not violate the then existing Constitution and that the provision mentioned was a valid legislative act and that all acts of the legislature in force when the Constitution of 1821 became operative were continued by express provision therein. (Const. of 1821, art. 7, secs. 7, 13.)
The relator as a corporation may invoke the protection *Page 289 
of the Constitution the same as an individual. (Santa ClaraCounty v. Southern Pac. R.R. Co., 118 U.S. 394; L.S. M.S.R.Co. v. Smith, 173 U.S. 684.) The right to take private property for public use is not dependent upon constitutional provision — it is inherent in the right to exercise sovereign power. That right in any free government is dependent, however, upon making just compensation therefor. It was also reserved by the Constitution of 1777 in the provision that "No member of this state shall be disfranchised, or deprived of any of the rights, or privileges secured to the subjects of this state by this Constitution, unless by the law of the land, or the judgment of his peers." (Constitution of 1777, section 13.) This provision of the Constitution was based upon a provision of the 39th chapter of Magna Charta. The phrase "law of the land" in the Magna Charta and in the Constitution of 1777 is equivalent to the phrase "due process of law." (Davidson v. New Orleans, 96 U.S. 97; 2 Kent's Comm. 13; Black's Constitutional Law [2d ed.], sec. 212.)
The rights or privileges secured to the subjects of this state by the Constitution included those contained in "such parts of the common law of England and of the statute law of England and Great Britain and of the acts of the legislature of the colony of New York as together did form the law of said colony on the 19th day of April in the year of our Lord one thousand seven hundred and seventy-five." (Art. 35.)
The rights to compensation for private property taken for public use was then secured by statute. The taking of private property for public use without compensation unless such property is taken in defense of the very life of a nation, is not by due process of law and it is also contrary to the fundamental principles of a free government and against natural right and justice. It would be an exercise of arbitrary power and an act of spoliation. *Page 290 
In Chicago, B. Q.R.R. Co. v. Chicago (166 U.S. 226) the court say: "Due protection of the rights of property has been regarded as a vital principle of republican institutions. * * * The requirement that the property shall not be taken for public use without just compensation is but `an affirmance of a great doctrine established by the common law for the protection of private property. It is founded in natural equity, and is laid down as a principle of universal law. Indeed, in a free government almost all other rights would become worthless if the government possessed an uncontrollable power over the private fortune of every citizen.' (Cases and authorities cited.) * * * The legislature may prescribe a form of procedure to be observed in the taking of private property for public use, but it is not due process of law if provision be not made for compensation." (p. 235.)
In Bradshaw v. Rogers (20 Johns. 102) SPENCER, Chief Judge, in the course of an opinion referring to the Constitution of the United States and to the Constitution of this state as it existed in 1821, says: "I do not rely on either, as having a binding constitutional force upon the act under consideration. The former related to the powers of the National government, and was intended as a restraint on that government; and the latter is not yet operative. But they are both declaratory of a great and fundamental principle of government; and any law violating that principle must be deemed a nullity, as it is against natural right and justice." (p. 106.)
The Bradshaw v. Rogers case was reversed in 20 Johnson, 735, but the reversal did not affect the decision so far as we have quoted from the opinion. In the opinion on the reversal the court again say: "This equitable and constitutional title to compensation, undoubtedly, imposes it as an absolute duty upon the legislature to make provision for compensation, whenever they authorize an interference with private right." (p. 745.)
In People v. Morris (13 Wendell, 325) it is said: "It is *Page 291 
now considered an universal and fundamental proposition, in every well regulated and properly administered government, whether embodied in a constitutional form or not, that private property cannot be taken for strictly private purposes at all, nor for public without a just compensation." (p. 328.)
In Lewis on Eminent Domain (3d ed. sec. 11) he says: "In some of the states, which have or have had, no provision on the subject, the right to compensation has been worked out through other provisions of the Constitution, such as the one that no person shall be deprived of life, liberty or property without due process of law. The latter is undoubtedly the correct view of the matter, for a law which authorizes the taking of private property without compensation or for other than a public purpose, cannot be considered as due process of law in a free government."
In Forster v. Scott (supra) the court was considering a case in this state which arose subsequent to the Constitution of 1821, but the decision is nevertheless placed not only upon the ground that the Constitution then expressly provided that private property shall not be taken for public use without just compensation but also upon the further ground that the statute deprived the owner of the enjoyment and possession of private property without due process of law, contrary to the constitutional guaranty.
We concur, therefore, with the relator in its claim that the provision in the acts of 1807 and 1813, that no compensation should be allowed for a building erected in whole or in part on any street, road or public place after the filing of said map, did not give to the municipality any right in the lands shown as streets, roads or public places on said map.
Matter of One Hundred and Twenty-seventh Street (56 How. Pr. 60); Matter of Furman Street (17 Wend. 649) and other cases so far as they are cited as authorities to sustain the contention of the city are not approved. *Page 292 
The alleged special franchise depends upon the facts as they are found and appear in the record. If the Harlem company obtained title in fee to the twenty-four-foot strip free from any condition or underlying right to use the lands for street purposes, the special franchise assessment so far as it includes such strip cannot be sustained. The claim by the Harlem company to such a title to that strip is challenged by the city.
When the consent of the mayor, aldermen and commonalty of the city of New York was given and accepted the prospective streets as laid down on said maps were expressly recognized and the right to thereafter open and maintain them as such and as of a date prior to any claim by the railroad company seems to have been assumed.
At that time that part of the strip of land between a point forty feet north of the north line of 48th street, and a point approximately on the center line of 84th street, was owned by the city of New York as a part of its common lands. That part thereof from about the south line of 107th street to the center of the old road formerly located between 115th and 116th streets, was held by the corporation of said city by virtue of a deed of cession for street purposes from Benjamin L. Benson, dated November 19, 1825 (Lewis v. N.Y. Harlem R.R. Co., 162 N.Y. 202) ; that part thereof from said old road to a point nearly coincident with the center line of 121st street, by said corporation by virtue of a deed of cession for street purposes from Peter Poillon dated July 24, 1827; that part thereof between the north line of 125th street and the north line of 129th street, by said corporation by virtue of a deed of cession for street purposes from I. Adriance, M. Floy, and C.H. Hall, dated January 16, 1828. All of that part thereof south of a point 40 feet north of the north line of 48th street was substantially upon what was known on the map and survey dated March 1, 1796, as *Page 293 
East road, and on the map filed in 1811 as Fourth avenue. It is assumed that the corporation of the city had sold all of the lands abutting said road or avenue south of a point 40 feet north of the north line of 48th street, and as we have seen it does not appear that it conveyed its right to maintain said road or avenue as a public street. The alleged title of the Harlem company to the part south of a point 40 feet north of the north line of 48th street is based upon a proceeding to condemn said lands for railroad purposes. In that proceeding said company did not obtain any greater rights than were then owned by those holding the title to the lots adjoining said avenue.
It is found that in the year 1825 Dudley Selden was the owner of that part of Manhattan island known as "Harlem Commons" which included the lands on which Fourth avenue is situated between 84th street and 91st street. In that year Selden caused a survey of Harlem Commons to be made and a map thereof filed in the office of the register of the city and county of New York, on which Fourth avenue was laid out to coincide with Fourth-avenue as laid out on said map of 1811. Prior to 1832 Selden conveyed to twenty-eight separate and several grantees all of the lots fronting on each side of said avenue, and in each of said deeds except two there was included in the description of the property conveyed the following statement: "also his right, title and interest of, in, or to the adjoining one-half part of the said Avenue or street on which the said lots are situated."
The Harlem company subsequently obtained a deed from Selden of the twenty-four-foot strip from 84th street to 91st street. He had previously conveyed his interest therein as stated. The company also obtained from four of Selden's grantees deeds which purport to convey strips of land within said boundaries of the following dimensions, viz.: 12× 130 feet, 12× 130 feet, 12× 25 feet and 12× 55 feet respectively. Selden, when he mapped his lands and *Page 294 
adopted the street, had title to about 1,860 feet along Fourth avenue as laid out by him and each of his grantees obtained by express grant, or by necessary inference, an easement in said avenue.
The Harlem company obtained from the apparent owner a conveyance of a strip of land twenty-four-feet wide in the center of Fourth avenue extending from the center line of 91st street to the northerly line of 91st street, a distance of but a few feet. It also obtained a conveyance of another part of said strip between the northerly side of 97th street and some other point south thereof not shown. It also obtained a conveyance of another part of said strip between 97th and 106th streets. The conveyance of that part of said strip was considered in Conabeer v.N.Y.C. H.R.R.R. Co. (156 N.Y. 474), in which, referring to the railroad company and its railroad on said strip, it was said: "The defendant's use of the street for the purpose of building, maintaining and operating its railroad was a legal one. It was constructed and is maintained and operated under and by virtue of the grant by Mrs. McGown and the combined authority of the legislature and municipality." (p. 487.)
It obtained a conveyance by a proceeding for the condemnation of the strip between 121st and 124th streets. It obtained a conveyance of another part of said strip between 129th and 135th streets.
Prior to the incorporation of the Harlem company the owner of the lands on which Fourth avenue is situated from 124th street to the Harlem river caused his lands to be surveyed and a map thereof was made, which was duly filed, showing the avenues and streets thereon as laid down on the map filed by the city in 1811, including Fourth avenue.
There is no evidence to establish even a claim of title by the Harlem company to the strip from 91st street to a point about midway between 93rd and 94th streets or of the strip from 106th to 107th streets. *Page 295 
The history of Park avenue shows that it includes what was known as the East road, and that the boundaries of East road and of said avenue were fixed and determined by the municipality. The municipality repeatedly, by declaration, accepted said road and avenue for street purposes. That fact is shown by the acts pursuant to the resolutions of 1794, the act of the legislature of 1807 and the proceedings pursuant to that act; the map filed by the commissioners named pursuant to that act and all the subsequent acts and proceedings on the part of the city, including many instruments of conveyance and the resolutions and proceedings relating to the Harlem company. It must be borne in mind that we are only considering the question whether the act incorporating the Harlem company and the title obtained by it to the twenty-four-foot strip in Fourth avenue is such as to give it a right in such strip independent of any claim of a special franchise therein. The municipality had sold the lands adjoining East road south of 48th street without conveying the right to maintain such road. It owned the land upon which Fourth avenue was shown upon said map between 48th and 84th streets; and it held a conveyance for street purposes of the lands between 106th and 121st streets, and between 125th and 129th streets; therefore, as the owner of the fee, or of the right to maintain a street by express grant from owners of the fee, it held more than three-fifths of the twenty-four-foot strip so far as it is now under consideration. The city in its dealings with the Harlem company recognized Fourth avenue as a street and dealt with the Harlem company, and the Harlem company with it, on the basis of Fourth avenue being an existing street. Fourth avenue was, at least as to the parts thereof last mentioned, an existing street as between the municipality and the Harlem company. A considerable portion of the avenue not so held by express grant to the municipality had, prior to the incorporation of the Harlem company, been mapped by the owners thereof with their abutting lands showing *Page 296 
Fourth avenue as laid down on the map of 1811, and such maps were duly filed. It is only of a small part of what remained of said avenue that the Harlem company holds conveyances unaffected by maps by the owners or by conveyances to the municipality. The parts so alleged to be held by it are disconnected and fragmentary. In each case the grantor or his predecessors in title had recognized Fourth avenue as an existing street by reference thereto in instruments of conveyance of one or more parcels or lots conveyed therefrom. Such conveyances in each case antedated the deed given to the Harlem company, and by such conveyances private easements were obtained by the grantees.
The city of New York, having power to lay out and open streets and to acquire lands for street purposes, has power to dedicate its own lands to such a use, and to bind itself by covenant with its grantees of abutting lands, that the lands so dedicated shall be forever kept as a public street. (Story v. N.Y.El.R.R.Co., 90 N.Y. 122.)
Referring to land owned by the city of New York in fee simple absolute this court in Matter of Mayor, etc., of N.Y. (186 N.Y. 237) say that where the absolute and unqualified title to land is owned by a municipality it may be used for any of the purposes of said municipality. So far as the city of New York is concerned it could undoubtedly have devoted its land to street purposes.
This court in Bennett v. L.I.R.R. Co. (181 N.Y. 431), referring to Fourth avenue and the owner of land abutting Fourth avenue purchased prior to the actual opening of the avenue, say: "The abutting owners had acquired easements in the highway which antedated the rights of the railroad company, and the latter's interference with such easements was in the nature of an unlawful encroachment or trespass." (p. 437.)
Lands dedicated for street purposes by a municipality with an assent thereto and release of all claim for damage by the owners make an existing street at least as *Page 297 
between them. Where one in dealing with property so dedicated to street purposes, although not actually in public use, recognizes the public right to use such land for street purposes he cannot thereafter in dealing with the same person repudiate the existence of the street.
The construction of the railroad on Fourth avenue was not only dependent upon the consent of the mayor, aldermen and commonalty of the city but it was built after the city had entered into a contract with it by which the railroad had agreed that if its railway should thereafter constitute an obstruction or impediment to the ordinary use of any street or avenue, it would provide a remedy for the same satisfactory to the city, and also that their railroad path should from time to time conform to what might thereafter be the regulation of the avenue or road over which itpassed. The avenue or road over which it passed so expressly recognized was Fourth avenue.
A special franchise granted to a railroad corporation is a right granted to it to maintain its road where, without such authority to do so, it would be unlawful. The consent of the city of New York was the authority made necessary by the act of the legislature of the state of New York before the Harlem company could build its road.
The case now before us differs from People ex rel. Hudson Manh. R.R. Co. v. Tax Commissioners (203 N.Y. 119, 132), in which it is said that the river, then being considered as a public highway, was not in contemplation as such when the grant was made. In this case Fourth avenue was designated as a public highway by the municipality, and it was mapped and it was mapped and treated as such by the several owners of property abutting on it and it was in contemplation as such in every act, resolution, consent and agreement leading up to the Harlem company's taking possession of its roadbed.
We have said that the situation of Fourth avenue at *Page 298 
the time of the incorporation of the Harlem company was peculiar. We repeat that while that avenue at the time of the incorporation of the company was not actually in public use as a street, the act of the legislature was passed with special reference to the map or plan of the city of New York and with reference to the streets and avenues at that time laid out on said map or plan, whether opened or not. The resolutions passed pursuant to said act of incorporation and the consent of the mayor, aldermen and commonalty of the city were given upon the assumption that the municipality had certain rights in the streets so laid out on said map. Such recognition is shown in every step relating to said railroad prior to the proceeding to formally open the avenue in 1850 as as well as thereafter.
Under the peculiar circumstances which we have in part enumerated, the Harlem company is estopped from asserting that it had an unqualified right to maintain a railroad in Fourth avenue prior to 1850 even on the fragmentary parts thereof for which it appears to have obtained conveyances from the owners of the fee.
The occupancy of Fourth avenue by the Harlem company was at all times dependent upon the consent of the public authorities. Such consent was necessary to consummate the company's general franchise and it was given and accepted in recognition of a right by the city and the several private owners of abutting lands to use the lands taken and have such lands used as a public street which right acquired by act of the legislature and subject to the provisions thereof constituted a special franchise.
It does not appear that the Harlem company could have obtained the consent of the city except upon the assumption that Fourth avenue was an existing street or that as against the company it should thereafter be so treated and considered by it. The Harlem company having entered into possession of the twenty-four-foot *Page 299 
strip on Fourth avenue pursuant to the consent and agreement with the municipality and under the circumstances disclosed as stated, their occupation thereof prior to the proceeding on the part of the city in 1850 to formally open Fourth avenue cannot now be treated as adverse to the municipality for the purpose of founding a right in the company in hostility to the present claim of the municipality that the railroad company is occupying said strip of land by virtue of a special franchise. (Lewis v. N Y Harlem R.R. Co., supra.)
The Harlem company having leased its tangible and intangible property, the value of such property as a producer of income is shown so far as the parties to the lease have expressed it, in the rental provided therein. The total of the rental for the year ending June 30, 1899, was $2,045,248.58, and the total mileage of tracks of its steam lines at that time was 308.57 miles. The total mileage of tracks on that part assessed and now considered is 17.76. The tangible property included in the franchise assessment was of the value of $5,000,000, or about one-half of the total assessment.
It is difficult, if indeed possible, to ascertain even with approximate accuracy, the part of said rental or of what should be the net income of the company attributable to the franchise through the part of Fourth avenue under consideration. The tax commissioners have assumed that the intangible property was worth as much as the tangible property. The relator in its brief refers to a well-established rule which it quotes as follows: "In all cases in the assessment for purposes of taxation, it is to be assumed that the valuation of the special franchise fixed by the state board is correct and that the burden of proof rests upon the relator who attacks the assessment to show that the method by which the assessors arrived at the result is incorrect if they had any method and that the assessment does not in fact exceed the fair value of the property assessed." The relator referring to the rule *Page 300 
says: "With this general statement as to the burden of proof we do not and cannot take issue."
The franchise of the Manhattan company is used by the New York, New Haven and Hartford Railroad Company and in connection therewith the railroad and other companies associated with that company. It is also used under the lease by the New York Central and Hudson River Railroad Company and all of the companies allied with it by agreement or otherwise.
In view of the location of Fourth avenue and the advantage to the railroad company of such location and the business done over it, and by reason of the franchise which enables the road to reach a central point in a great city, if the receipts therefrom are arbitrarily determined by the mileage thereon in proportion to the total mileage of the Harlem company, it is obviously unfair and an inadequate means of determining a basis for its valuation. The value of such a franchise cannot be accurately determined by comparison of its mileage with the mileage of a right of way or franchise on a street of a remote village or township. A comparison of the passenger mileage on Fourth avenue with the total passenger mileage of the Harlem company will not result in an accurate determination of relative values, although such a comparison would be of more value in determining the value of the Fourth avenue franchise than a comparison of the track mileage alone. Any comparison of track or passenger mileage necessarily spreads the earnings over the mileage, without taking into account the value of a franchise at a particular place to increase the earnings of the system of road with which it is connected. A particular franchise is frequently of important value in connection with a railroad system as a means of obtaining and retaining business. Where a special franchise relates simply to a point or portion of a railroad system its value to the system must be considered in connection with all the surroundings and facts which aid in the determination *Page 301 
of such value. This thought is expressed by Mr. Justice SWAYZE inWest Shore R. Co. v. State Board of Assessors
(81 Atl. Rep. 351), in considering a valuation of the West Shore R.R. in New Jersey as a proportionate part of the West Shore system, in which he says: "We are not impressed by the figures of receipts and costs of traffic presented by the prosecutor. It may well be that the earning power of the 19 miles in New Jersey may be small considered by itself, but that by no means measures the value of the franchise for a railroad connecting the 404 miles north of our state line with tidewater opposite New York city. We can form some idea of the value of the New Jersey franchise if we think of the difference between the value of a railroad from Buffalo to Tappan without an outlet, and the value of the same road with the outlet which the New Jersey franchise gives. * * * We know that the lessee was willing to pay a rental of $2,000,000 per annum and agree to pay that sum for 475 years. A property producing such a rental guaranteed for so long a period is a very valuable property, and a large part of that value is due to the franchise to run a railroad from Tappan to Weehawken." The relator in its report made by it in 1880, referring to these franchises says: "If the Harlem were clearly detached from the New York and Hudson River and could put up for bids the use of its access into the city and its franchises therein by lines rival to the New York Central and Hudson River the rent it derives from the existing lease would appear small."
The manner of computing the value of a special franchise is dependent upon the facts and circumstances in each case. Where the net earnings of a special franchise can be computed with reasonable certainty, as in People ex rel. Jamaica W.S. Co. v.Tax Commissioners (196 N.Y. 39), an assessment thereof based upon a computation therefrom is approved by the courts. No hard and fast rule by which the board of tax commissioners must *Page 302 
be controlled in valuing a special franchise for the purpose of taxation has been adopted by the legislature or laid down by the courts. The valuation of the special franchise of the Harlem company is peculiarly difficult, arising principally from uncertainty about the amount that shall be treated as the net earnings of such special franchise. This is recognized by the relator. It says in its brief: "The analysis of this case is attended by a difficulty which does not exist with reference to the ordinary special franchise connected with a street surface line constructed wholly within the limits of a town or city and wholly upon admittedly public streets. * * * Such earnings as can be predicated of it must be made in connection with transportation over railroads not constituting a special franchise. Its sole earnings are therefore proportionate and must be arrived at by calculation."
Elaborate statements are in evidence based principally upon a proportion of the mileage included in the assessment in comparison with the total mileage of the Harlem company and a comparison of the mileage of passengers carried upon the tracks upon that part of Fourth avenue under consideration in comparison with the total mileage of passengers carried on the Harlem road and upon the road of the relator. This evidence, although proper for consideration, is not, in our judgment, sufficient in view of all the findings to require as a matter of law, the conclusion that the assessment was erroneous by reason of overvaluation or to shift the burden of proof resting upon the relator to show that the assessment is erroneous.
There is no question before us as to what further evidence can be produced to make more clear and certain the value of such special franchise.
In the Jamaica W.S. Co. case the court, quoting from a learned referee and referring to the tax commissioners, say: "The only rule for their guidance is the actual value of property to be assessed, and they may avail themselves *Page 303 
of all tests of such value within their reach, and of every fact, and information which in their judgment has any bearing upon such value." (p. 52.)
The city insists that the Appellate Division was in error in affirming the order of the Special Term so far as it reduces the assessment of the special franchise, to make it conform with the assessments of real property within the city of New York. The court has found that the final assessment of $10,192,000 for the year 1900, fixed by the state board of tax commissioners, was the sum of the amounts found by them to represent the value of the tangible property and the intangible element respectively, and represented in their judgment the full value of such alleged special franchise. Upon such finding it was the duty of the court to reduce the assessment to correspond with the percentage of the assessment of real property in the city of New York to its actual value. (People ex rel. Jamaica Water Supply Company v. StateBoard of Tax Commissioners, 196 N.Y. 39; People ex rel. Hudson Manhattan R.R. Co. v. State Board of Tax Commissioners,203 N.Y. 119.) It does not appear necessary for this court to discuss in this opinion the many other claims of the intervenor upon which it urges that the special franchise can be sustained.
We conclude that the order of the Appellate Division should be affirmed, without costs to either party.
CULLEN, Ch. J., WERNER, WILLARD BARTLETT, HISCOCK and COLLIN, JJ., concur; GRAY, J., taking no part.
Order affirmed. *Page 304