Schreiber, J.
This is a consolidated tax review proceeding affecting the assessments on the property known as 350 Fifth Avenue, the ‘1 Empire State Building ’ ’, located at the southwest corner of 34th Street and Fifth Avenue, borough of Manhattan, city of New York, for the tax years 1950-51 through 1953-54. During the first two tax years the tax department separately assessed 27 West 33rd Street, then known as Tax Lot 19. This was abandoned so that for the last two years the entire property was assessed as a single lot, to wit, Lot 41.
The assessments and the claimed values are as follows:
Assessments Claimed Values
Year Lot Land Building Total Total
1950-51..... ... 19 $330,000 $330,0001 41 10,250,000 24,250,000 34,500,000/ $27,225,000
1951-52..... ... 19 330,000 120,000 450,0001 41 10,250,000 24,250,000 34,500,000/ 27,300,000
1952-53..... ... 41 15,300,000 29,700,000 45,000,000 27,000,000
1953-54..... ... 41 15,300,000 29,700,000 45,000,000 • 27,000,000
The petitioner contends that these land and building assessments are grossly excessive.
The subject property consists of the block fronting on the west side of Fifth Avenue from 33rd to 34th Streets, running west from Fifth Avenue to a depth of 500 feet on 33rd Street and 425 feet on 34th Street, the rear 75 feet on 33rd Street having a depth of only 98.9 feet.
The land plot had formerly been the site of the old Waldorf Astoria Hotel and then included all of the existing plot except the most westerly 75 feet on 33rd Street. The property was acquired in 1929 at a cost of $14,000,000 plus the cost of cancellation of leases. It was on that plot that the Empire State Building was erected. Later, the most westerly 75 feet on 33rd Street were acquired and thereafter there was constructed thereon an off-street loading platform on the superstructure of which there is now erected a water cooling tower, operated in connection with the chilled water system now available to the tenants of the Empire State Building.
Construction of the Empire State Building, a modern office building with stores on the street floor, began with the demolition of the old Waldorf Astoria Hotel on October 1, 1929. By February, 1930, the old hotel building was completely demolished. Construction of the Empire State Building was then *521 commenced and a certificate of occupancy was issued on April 24, 1931, when it was substantially completed.
The original cost of the structure was $27,578,610.80. Thereafter additional expenses were incurred for the construction of the loading platform, the air conditioning and other items, so that the total cost of the structure is about thirty million dollars.
During each of the four tax years included in this proceeding approximately 1,950,000 square feet were rented. This space spreads over 84 floors. At the 86th floor there is a setback which, together with the inclosed space on that floor, serves as the lower observatory; the 87th floor is rented to the New York Telephone Company; the floors 87 to 102 are in the tower space on top of which is a mooring mast which was originally designed to serve as an anchorage for dirigibles. There is a higher and smaller observatory on the 102d floor which is somewhat below the top of the mooring mast. The distance from the ground level to the top of the mooring mast is approximately one thousand two hundred and fifty feet.
In or about 1951 there was installed above this mooring mast a structure known as the televisión mast. This is about two hundred twenty feet high and on it hangs the electronic transmitting apparatus of television broadcasters who are office tenants in the building. The cubical content of the building is 36,225,000 cubic feet for the building and 95,210 cubic feet for the loading platform on 33rd Street.
The building originally had not been air conditioned, but within the last few years a chilled water system was installed which at this time is serving a portion of the building. The tenants are obliged to pay for the installation and equipment expenses necessary to convert the chilled water system into a cooled air system.
In the early years there were many vacancies in the Empire State Building. The vacancy rate was extremely high between the years 1933 and 1944, but since that year vacancies decreased and the building is now well occupied. Occupancy percentage ran from 97.25% to over 99% between the years 1945 and 1952.
Many of the leases on this building expire in 1954, 1955 and 1956 and great consideration must be given to the increased rental income that will result from renewal of leases.
Petitioner’s real estate expert stabilized the rent at $8,000,000 per year and added $150,000 for the rental of the space occupied by the petitioner and $140,000 for the rent of the observatory. Its potential income is stated to be $8,290,000 fdr all the years herein.
*522 It had not included income from miscellaneous sources and the television mast. The court finds that this income amounts to $475,000 and would thus make a total potential rent income of $8,765,000 for the last two years, based largely on the petitioner’s figures. Consideration must be given to the actual rents as shown in petitioner’s books for the years 1951, 1952 and 1953, when they were $8,153,948, $8,527,994 and $8,901,940, respectively. These rents do not include the additional income from the observatory, television mast, petitioner’s rented space and other miscellaneous sources. The court finds that the potential gross income for the years 1950 and 1951 is $8,900,000 and for the years 1952 and 1953, $9,265,000. There should be allowed $800,000 for vacancies in both office space and store space. The expense of maintaining the property is $3,000,000. A total of $3,800,000 should be deducted from the income of $8,900,000, leaving a net annual profit of $5,100,000 for the years 1950-1951 and 1951-1952, and after deducting $3,800,000 from the income of $9,265,000 we have a profit of $5,465,000 for the years 1952-1953 and 1953-1954.
The city respondent has treated the entire net income from the observatory and from the television mast as rental income, whereas the petitioner takes the position that it is conducting the business of maintaining an observatory and the business of maintaining the television mast, and that only a fair rental should be charged for the space occupied by the observatory and for only the office space used by the broadcasters.
The income from the observatory is from the sale of admission tickets, souvenirs, cigarettes and other miscellaneous items. After paying for the merchandise sold and general expenses for salaries for guards, management, promotion, etc., the average net income from this source for the five years from 1949 to 1953, inclusive, was $600,000. A casual examination of this sheet discloses the operation of the observatory and the income and operating expenses of the same, and readily indicates that the maintenance of the observatory is in fact the conduct of a business and that the income is from a business, and not from real estate. The court agrees with petitioner’s real estate expert as to the rental value and fixes $140,000 per year for the observatory space.
The television mast is used by broadcasting companies, tenants in the building. The mast occupies space in the building the same as other rented space. That it is on the top of the structure, where maximum efficiency can be obtained, is not significant. The mast cannot be disassociated from the structure *523 supporting it — the building herein. The leases to the broadcasters are on the same form generally used throughout the building, with special riders attached thereto applicable to the different purposes for which the TV tenants utilize their space.
The rent paid for the use of the mast is rental income to the same extent as is the rent paid for office space by these various broadcasters. Bach of the broadcasters, seven in number, pays in addition to the rent for office space $70,000 per year for space on the television mast, to which they attach their broadcasting antennas. The net income realized from the space on the mast is found by the court to be rental income, and the potential rent is found to be $300,000 per year. This figure is reached by first deducting petitioner’s expenses in supervising the use of the mast, from the gross income on same.
Land Values
The land assessments and the values of the respective experts are as follows:
Year Lot Assessment Hammer Milner
1950- 51.............. 19 $330,000 $8,800,000 $15,000,000
41 10,250,000
1951- 52.............. 19 330,000 8,800,000 15,000,000
41 10,250,000
1952- 53............. 41 15,300,000 8,800,000 16,000,000
1953- 54............. 41 15,300,000 8,800,000 16,500,000
Upon this record the land assessments have been demonstrated to be excessive by the overwhelming weight of the evidence, the transactions affecting the subject land, the decisions of the courts affecting other comparable land, the sales of comparable property, and by all other factors and elements relevant to land valuation.
The organic statute relating to valuation of land for tax purposes requires that the assessor state the sum for which “ each separately assessed parcel * * * would sell under ordinary circumstances if wholly unimproved ” (Administrative Code of City of New York, § 158-1.0). It is quite clear that no special premium may under the law be added to the value of the land solely because that land has been improved by an adequate structure.
The court has taken into consideration the fact that the land was sold in 1929 for about $14,000,000. Immediately thereafter there was a great falling off of values.
The respondents urge that there was paid by petitioner when it bought the property in 1951 the total sum of $51,000,000, and that this sale is a good measuring rod for the value to be fixed by the court.
*524 In 1951 Empire State, Inc., the owner of the fee, was dissolved and thereupon it conveyed its assets in liquidation to its stockholders. The stockholders then owning the freehold conveyed the fee of the land only to Prudential Life Insurance Company for $17,000,000 and received back a long-term lease of the land, at 6% of the purchase price for thirty years, with renewal options totaling sixty-nine years. The ground rent under the renewal options was to be 2% of the purchase price, or $340,000 per year. This $17,000,000 was then used to pay off a first mortgage on the freehold. Then the stockholders conveyed the fee in the building and the improvements thereon, together with the lease of the land, to the Imperium Corporation for approximately $34,000,000, which the corporation raised by placing a first and a second mortgage, totaling $20,500,000, and by the sale of debentures aggregating $10,500,000 and the sale of stock for $3,000,000. Fifty million dollars was paid for the stock of the Empire State, Inc., and the remaining $1,000,000 was used to defray expenses. The name of Imperium Corporation was then changed to Empire State Corporation.
The court has given due consideration to this transaction. Insofar as the sale of the land to Prudential Life Insurance Company for $17,000,000 is concerned, where the seller took back a ground lease, it is common knowledge that such a tie-in sale has no bearing on the market value of the land. The sales price of $17,000,000 and the amount of the lease rental are completely interdependent and represent a financial transaction, not a real estate deal. Such a tie-in sale is hardly a sale under “ ordinary circumstances ”, as specified in section 158-1.0 of the Administrative Code of the City of New York.
After giving full consideration to all relevant factors, the court finds that the land should be valued at $12,000,000 on each of the tax status dates.
Taking into consideration the actual and potential net income of the property and all relevant factors, the court finds that the economic value of the building for the tax years 1950-1951 and 1951-1952 is $34,660,000 and for 1952-1953 and 1953-1954 is $37,700,000.
The total economic values are, therefore:
Year Land Budding Total
1950- 1951 $12,000,000 $34,660,000 $46,660,000
1952- 1953 12,000,000 37.700.000 49.700.000
1951- 1952 12,000,000 34.660.000 46.660.000
1953- 1954 12,000,000 37.700.000 49.700.000
*525 Building Costs
The actual cost of the construction of the building in 1930, as taken from the petitioner’s books, was $27,578,610.80. About three million dollars was spent on it thereafter. At that time building costs were very low.
The petitioner’s building expert testified that the total field cost before making any deductions for depreciation and before adding the carrying charges was as follows on the taxable status dates herein involved:
January 25, 1950 $39,063,322
“ 1951 43,831,032
“ 1952 45,875,561
“ 1953 46,650,200
. The respondents’ building expert gave as his opinion that the total field cost before making any deductions for depreciation and before adding the carrying charges was the following on the taxable status dates herein involved:
January 25, 1950 $46,390,730
“ 1951 49,180,902
“ 1952 52,786,134
“ 1953 56,704,171
The court finds that the field costs given by the petitioner’s building expert are reasonable except as to certain items. The costs for structural steel should be $500,000 more than is shown by him and his charges for builders’ fees, architects’ fees and general conditions are found by the court to be inadequate to the extent of $700,000. The court therefore adds $1,200,000 to the field costs of the petitioner’s building expert for each of the tax years under review.
The court finds that the petitioner’s building expert depreciated the various items constituting the reproduction costs to an unreasonable extent. The depreciation found by the court would mathematically constitute a depreciation factor of 1.65% per year. However, the court did not depreciate the items in that manner, but depreciated each item separately.
The carrying charges, which are made up of interest on the land value, taxes, and interest on the field costs during construction, should be added to the costs of reconstruction. However, the carrying charges must be depreciated in the same manner as all of the items going into the construction of the building. The court finds that the reconstruction costs, carrying charges and depreciation for the years involved are:
*526 1950-1951
Reconstruction cost......................$40,263,320
Carrying charges........................ 2,999,500
43,262,820 .
Less depreciation ............... 13,862,550 ■
As of January 25, 1950, reconstruction cost
plus carrying charges less depreciation.....$29,400,270 .
1951-1952
Reconstruction cost......................$45,031,032
Carrying charges........................ 3,267,263
48,298,295 .
Less depreciation ............... 14,838,200
As of January 25, 1951, reconstruction cost
plus carrying charges less depreciation.....$33,460,095
1952-1953
Reconstruction cost......................$47,075,561
Carrying charges..................3,364,933
50,440,494
Less depreciation................ 16,140,8.86
As of January 25, 1952, reconstruction cost
plus carrying charges less depreciation.....$34,299,608
1953-1954
Reconstruction cost......................$47,850,200
Carrying charges........................ 3,401,775-
51,251,975
Less depreciation................ 17,066,503
As of January 25, 1953, reconstruction cost
plus carrying charges less, depreciation..., .$34,185,472
As herein pointed out, the value of the property arrived at by the capitalization of income has been fully considered by the court. It is more than the reconstruction cost less depreciation on each of the tax status dates. Our courts have held that in the absence of extraordinary circumstances, the reconstruction *527 cost less depreciation remains the maximum value which may be assessed upon real property (People ex rel. Manhattan Square Beresford v. Sexton, 284 N. Y. 145; People ex rel. Parklin Operating Corp. v. Miller, 287 N. Y. 126; People ex rel. Hotel Paramount Corp. v. Chambers, 298 N. Y. 372).
After carefully considering all of the credible evidence adduced upon the trial, the court finds that the maximum value which may be assessed upon this property for each of the years under review is therefore as follows:
Year Land Building Tota
1950- 1951.................... $12,000,003 $29,403.270 $41,400,270
1951- 1952.................... 12,000,000 33,463,033 45,463,030
1952- 1953................... 12,000,000 34,2)9,603 46,299,600
1593-1954.................... 12,000,000 34,185,470 46,185,470
It will be noted that the value of the land as fixed by the court is less than the assessed valuation for the latter two years involved, whereas the reconstruction value less depreciation of the building, which is the highest value at which the building may be assessed, is in excess of the assessments. The total value of both land and building as found by the court is greater than the total assessments herein. It must be noted that only the total assessments can be reviewed (Tax Law, § 21, subd 3; Matter of 754 Fifth Ave. v. Boyland, 279 App. Div. 908).
All motions, except the motion to dismiss, on which decision was reserved, are denied.
Under the circumstances, the assessments are confirmed and the petitions dismissed. Costs to respondents. Settle order.