Howard T. Hogast, J.
These consolidated proceedings are brought under article 13 of the Tax Law to review the assessments upon certain real property situated in the County of Nassau for the tax years beginning May 1, 1957, May 1, 1958 and May 1,1959. The 9 tax lots involved are numbered 1243 to 1251 inclusive, and lie in section 11, block D, on the tax map of Nassau County. For the purposes of this proceeding, it was stipulated that all of them be considered as 1 tax lot without separate reference to each. It was further stipulated that the proceedings for each of the 3 tax years be tried together on the issue of valuation.
The total of the assessments under review are as follows:
1957- 58........$4,675,580 (Land and Improvements)
1958- 59........ 4,764,410 ” ”
1959- 60........ 4,772,780 ”
Respondents have admitted in response to petitioner’s demand, “ that Forty (40%) per centum, is the ratio which *975 the assessed valuation of the real property of the tax district bears to its full valué This indicates that the following are the true values for petitioner’s property as found by them:
1957- 58 .........................$11,688,950
1958- 59 ......................... 11,911,025
1959- 60 ......................... 11,931,950
The petitions are based solely on the allegation of inequality, and state that ‘ ‘ the instances in which said inequality exists ’ ’ are “ all other property within said County of Nassau assessed upon said assessment roll other than said property of petitioner.”
This leaves two issues for determination by the court — the true or actual value of petitioner’s property and the ratio between true value and assessed value prevailing in Nassau County. The application of this general ratio to the actual value of the petitioner’s property as found will determine the correctness of the respondents’ assessments.
The court will deal first with the problem of ratio. Unlike the Board of Assessors of the City of New York, the Board of Assessors of Nassau County does not assess taxable property at its actual present value, but at its value or construction cost as it was, or would have been, in 1938. The ratio between this figure and the actual present value of property is expressed in terms of percentage. Petitioner, as aforesaid, served a demand pursuant to section 292-a of the Tax Law (now Beal Property Tax Law, § 716), dated March 18,1959 that the respondents admit that this ratio is 36%. Respondents served a denial, dated April 3, 1959, admitting, however, that the ratio is 40%.
Section 293 of the Tax Law (now section 720 of the Real Property Tax Law) provided two methods of ascertaining what actual ratio was being applied. The first was by the appraisal of the true value of a number of parcels of real property either agreed upon by the parties, or selected by the court, said valuations to be without reference to assessed valuations. Such appraisals would then be compared with the corresponding assessed valuations of the respective properties and the resulting ratio could be accepted as evidence in the proceeding before the court.
The second was based, not upon the appraisal of selected properties, but upon “ evidence as to actual sales of real property within the tax district that occurred during the year in which the assessment under review was made ”. It provided that this evidence could be given by either party.
*976 The latter method was used by the Referee and approved by the court in Borst v. Board of Assessors, City of Amsterdam, (6 Misc 2d 945).
It was also approved by the Court of Appeals in People ex rel. Yaras v. Kinnaw (303 N. Y. 224, 233) when the court stated: £ £ The only other evidence properly to be considered was that of sales made in Albany in the year ending August 31, 1948. * . * * This line of evidence — and it is entitled to substantial weight under section 293 — would indicate a ratio of 61.5% ”.
Petitioner elected to use this, latter method exclusively. The respondents, if they had wished, mig’ht have availed themselves of either method, and, if the parcels of property to be valued under the first method could not be agreed upon the court would have selected them. They chose, however, to use neither, nor did they challenge during the trial the accuracy of the figures offered by the petitioner, although they had reserved their right to do so.
However, they raised in their memorandum the objections that some of the sales may not have been at arm’s length, but, with the opportunity to examine them they produced no evidence of any such sales.
They further objected that there was no distinction made between improved and unimproved land. This has no merit, since the ratio must be applied uniformly to every type of taxable real property.
The method by which the petitioner assembled its proof, in essence was as follows: It obtained a stipulation from the respondents that the ratio issue would be tried on the basis of the assessment roll made public on May 1, 1957 and that ££ the result will apply equally to the two other years, namely, 1958 and 1959 ’ ’, and a further stipulation that ‘£ the revenue stamps appearing on the deeds may be used as evidence of the sales price where sales are referred to but each party reserves the right to produce additional evidence with respect to the consideration in any one sale if he so advises ’ ’.
It retained one W. Edwards Deming, a consultant statistician and a professor of statistics at the Graduate School of Business Administration of New York University, whose education and experience, as spread upon the record, qualified him in his field beyond question, to obtain a fair sampling of the deeds recorded in the office of the Clerk of Nassau County between May 1, 1956 and April 30, 1957. This witness, using a scientifically devised table of random sampling numbers, compiled lists referable to pages in the libers of conveyances for this period. The consider *977 ation for each recorded transaction was then determined from the documentary stamps. Three hundred forty such sales were tabulated in this fashion. In addition, every sale in the county during the year, in which the consideration was reported in a publication known as “ Nassau Realty Statistics ” to be $75,000 or more was examined. Approximately 190 sales in this latter group were included in the tabulation.
Then the assessment rolls for the period commencing May 1, 1957 were examined and the assessment of each individual property was set against its sales price. The results of the computations of ratio were as follows:
The total of the assessed valuations of all the properties sold for $75,000 or more was 32.36% of the total of all the reported sales prices. When the ratio of the assessed value of each parcel to its selling price was averaged with that of every other ratio in this group the result was an average ratio of 34.38%.
The ratio of totals in the other group was 33.55% while the average of the individual ratios was 33.36%.
Dr. Deming conceded a possible error of 1.5% in either direction. Taking the highest ratio that is, the relation between the averaged selling prices of the properties reportedly sold for amounts in excess of $75,000, to their averaged assessed valuations, and adding 1.5% as the maximum margin of error, the figure 35.88% represents a scientific approach to the true ratio which this court accepts for the purposes of this proceeding. No evidence tending to disprove or discredit this method of proof was offered by the respondents. They urged only in their memorandum, that some of the sales might have included articles of personal property which were reflected in the purchase price. If the price of these articles was substantial, as in the case of factory machinery, it is reasonable to suppose that it would be treated separately as the sale of personalty, not only to avoid real estate and transfer taxes, but possibly for the purpose of placing chattel mortgages upon them.
At any rate, the number of transactions examined, which must have included many commercial and industrial buildings sold for $75,000 and more, as well as unimproved land, would tend to minimize such possibility of error.
It was said by the Court of Appeals in People ex rel. Hagy v. Lewis (280 N. Y. 184, 188): “ Thus the idea of the statute appears to be that a sufficiently approximate arithmetical mean can be established by pooling a number of parcels (so selected) and comparing the aggregate of their assessed valuations with *978 the aggregate of their full values. * * * We cannot say that such a process is inadequate for practical attainment of the rough equality which is all that has heretofore been possible under any system of taxation.”
The petitioner has presented 530 transactions, chosen blindly and at random. This far exceeds any number of properties which could have been selected by the parties and appraised by experts for both sides, using the first method set forth in section 293 of the Tax Law. The result here achieved, within the margin of allowable error, seems at least as valid as any which might be achieved by that method.
This scientific approach to the problem has certain distinct advantages over the alternate procedure authorized by the statute. In the latter, opinion evidence of appraisers as to.the true value of parcels of real estate selected may vary greatly. In this very proceeding, for example, the appraisals of the subject property by three experts of unquestioned integrity who rank high in their profession and who have many years of experience upon which to base their opinions, vary from $5,055,500, (Edwards) and $5,500,000 (Oppenheim) to $12,984,000 (Nesser).
Petitioner’s method of obtaining sampling of recorded sales, utilizes a statistical procedure now universally recognized and applied in many fields of industry, commerce, science and research. Dr. Deming’s enumeration of its uses establishes the wide acceptance it has achieved.
The use of tables of random numbers reduces to a minimum the possibility of human error and inclination in the selection of samples. Moreover, the great number of samples which may be considered by the use of this method reduces the significance of any abnormalities which possibly may have been present in some of the transactions by averaging them out.
The court has given much consideration to this relatively new method of ascertaining ratio and has found no valid reason why it should not be given substantial weight when properly applied. Certainly in this case, where the respondents have offered absolutely no evidence to discredit it, nor proof of any other nature to establish a different ratio, it is entitled to acceptance.
The second determination to be made is the true value of the land and of the improvements for each of the three tax years in question. The tax lots which by stipulation are to be considered as a single parcel aggregate 65.95 acres with a single frontage of approximately 1,550 feet along the west side *979 of Broadway, a northerly side line of 1,671.42 feet and a southerly side line of 2,076.20 feet, from the southwesterly corner of which there is omitted a tract of approximately 2 acres.
This land was purchased in 1952 at a cost of $360,970.44. It was then limited to residential use by the Building Zone Ordinance of the Town of Oyster Bay. In or about 1953 it was rezoned at the petitioner’s request from a “Residence D ” district to a “ Business G ” district, on condition that petitioner execute certain recordable declarations and covenants restricting the use of the land by providing for building setbacks and maximum heights, parking areas equal to twice the area of the ground floor of all commercial buildings, and fencing. In addition, the lease subsequently made with Gertz Department Store also required the petitioner to reserve a very substantial portion of the property for parking purposes.
Petitioner’s Exhibit 4 indicates that 89,400 square feet, or 2.05 acres of the whole, are reserved for the future widening of Broadway, 980,900 square feet or 22.52 acres are devoted to actual parking spaces; 1,023,810 square feet or 23.50 acres to roads to the parking spaces; 139,530 square feet or 3.20 acres to landscaping; 26,400 square feet or 0.61 acres to a recharge basin; and 193,776 square feet or 4.48 acres to sidewalks. Only 387,300 square feet or 8.89 acres are devoted to buildings. More than two-thirds of the property, therefore, was required to meet the conditions governing parking space set forth in the aforesaid covenants with the town, and less than 14% has been devoted to buildings.
The petitioner’s expert, Edwards, valued the land as follows:
1957- 58 ..........................$1,151,800
1958- 59 .......................... 1,770,740
1959- 60 .....................'.....1,011,100
or an average of $16,880.97 per acre. The reason for the decrease in value in the last tax year is that he appraised the improved property as a whole and using a capitalization method, allocated 20% of the total to the land and found that the whole, because of “ the increase in expenses ”, suffered a loss in value.
Petitioner’s other appraiser, Oppenheim, testified to a value of $14,500 per acre for the land, or a total of $950,000 based upon inference and comparable sales. Neither party questioned him on these sales, and they are not in evidence. He testified that in his opinion the land reserved for parking purposes was unusually large and that much of it was rarely used. He gave as his opinion that the enterprise could operate, except at peak *980 periods, with 30% of the present area and that 60% would be adequate for all purposes.
The court, from its own observations on various occasions, agrees that at this stage in the development of the shopping center, the amount of land reserved for parking by reason of the restrictive covenants and the aforesaid lease is somewhat excessive.
The respondents’ appraiser, Nesser, a regional director and assessor of J. M. Clemenshaw Company, arrived at a value of the land by accepting the assessed valuation placed on it by the county (which figure is under attack in this proceeding) and by applying to it an arbitrary ratio of 38.6%.
In this manner he arrived at a full land value of $4,000,600. He testified to no comparable sales nor did he make use of any capitalization formula to obtain this figure. His appraisal is based solely upon two premises — that the County Assessor was correct in assessing the land at $1,547,625 and that the ratio between assessed valuation and full value is 38.6%. He offered not a scintilla of evidence to justify either. This does not constitute acceptable proof, particularly since both premises have given rise, in fact, to the very issues which are being-tried.
Moreover, his appraisal is further weakened by his statement: ‘ ‘ the development of land through building creates value inherent in the land ’ ’. The law of this State is set forth in People ex rel. Empire State Building Corp. v. Boyland (1 Misc 2d 518, 523, affd. 1 A D 2d 770, affd. 5 N Y 2d 715), as follows: “ It is quite clear that no special premium may under the law be added to the value of the land solely because that land has been improved by an adequate structure.”
Respondents’ other land appraiser, De Costerd, gave a value of $1.25 per square foot, or a total of $3,590,000 for the land. He based his appraisal upon a list of 7 comparative sales of land in different parts of the county for various types of shopping centers. Upon cross-examination it appeared that the unit price of these ranged from $0.76 to $2.15 per square foot. The largest consisted of 15% acres, the smallest of less than 2 acres. Most of them are improved as “neighborhood shopping centers ”. The subject property, on the other hand, is conceded to be a regional shopping center, designed to serve a wider area. There are at present two other such properties in Nassau County, one being located at Roosevelt Field in Garden City, the other in Valley Stream. Figures on the cost of these sites were not presented to the court, possibly because they were not available.
*981 The court has familiarized itself with all of these properties. They are distinguishable in a number of respects and are of only limited use in arriving at a comparative value of this property. Four have double frontage. The frontage in every case but one exceeds the depth by a considerable margin and that one exception has frontage on all four sides. In those which are improved the building area occupies a much more substantial part of the land than do the buildings on the subject property.
When it is considered that the subject property suffers (at least at the present time) from an enforced unfavorable ratio of parking space, service roads and drainage area to building area and is burdened with the maintenance of these partially unused facilities, some of which are virtually unproductive, the basis of comparison becomes narrow.
One sale for example, which brought $2.15 per square foot, was of 15% acres located on the southwest corner of Northern Boulevard and Searingtown Road in Manhasset. It has a frontage of approximately 1,030 feet on what is popularly called the “ Miracle Mile ”, one of the choicest shopping areas in the entire metropolitan district. It is developed with a large chain food store and a number of specialty shops, which, together with a marginal road, occupy nearly 50% of the land, the remainder in the rear being reserved for parking.
Giving due weight to the evidence and to all these factors the court finds the averaged actual value of the land to be $30,000 per acre, or a rounded total of $1,980,000.
It now turns to the valuation of the improvements, considering first their replacement cost less depreciation. It seems preferable to treat with this before analyzing their capitalized value, since the applicable law has been stated as follows: “In the absence of evidence to the contrary, replacement cost, less depreciation, would undoubtedly be deemed the value of the segment, but that presumption is by no means conclusive; it simply fixes the upper limit beyond which the assessment cannot go * * * no property is worth more than it would cost to replace it. It follows that where replacement cost is accepted as one of the measures of the value, it merely fixes the upper limit beyond which the court will not go, but that it does not necessarily determine that the property is worth that figure. Many times it is worth much less.” (People ex rel. Lehigh Val. Ry. Co. v. Harris, 168 Misc. 685, 689, affd. 257 App. Div. 912, affd. 281 N. Y. 786; italics supplied.)
John Mitschang, comptroller for Mid-Island Shopping Plaza since May, 1957 testified as follows:
*982 “ Q. What is your total figure for this construction cost? A. As of May 1, 1957, $10,092,609.47.
‘1 Q. What does that figure include ? A. It includes the prime cost, that is bricks and mortar, the site work and utilities, the tunnel, the paving, the extra work we had to do within the stores, that is the lighting fixtures, if we had to make concessions to tenants as was brought out this morning, and those costs were also included. In addition, it includes the direct job payroll of Wallen Contracting Corp., which did the actual construction. They hired constructors, master mechanics, service labor, all that labor is in there.
‘ ‘ Q. Does this include the overtime that Mr. Stackler referred to? A. Yes. It also included a fee which Wallen Contracting charged to Mid-Island. As of May 1,1957 that fee was $265,875.
“ Q. Mr. Stackler also testified to certain capitalized expenses. Is that figure included in this total? A. That figure —let me qualify it this way — I would say that fee is partially included. That is, capitalized interest and insurance during the period of construction is partially capitalized in that.
‘‘ Q. In respect to May 1,1958, what are the land and *. * * A. The land cost remains the same. The building cost booked as of that date, $10,821,271.46. These figures make no attempt to book what we call approved vouchers and retentions payable — in other words, reserved to complete. These are actual expenditures and charged on the books of account.
“ Q. The difference between the 1957 and 1958 figure is accounted for by what, generally? A. Generally by the payment of bills outstanding as of the May 1, 1957 date which were not included in that $10,000,000 figure I gave you, plus any additional work we may have done when new tenants came in.
‘1 Q. The figure for May 1,1959 ? A. The figure is $11,041,505.23.
“ Q. This is construction costs? A. Again, construction costs. ‘1 Q. How about the land figure ? A. It is exclusive of the land figure. The land figure remains the same.
“ Q. Do the figures for 1958 and 1959 include all of the figures which were included in the 1957 figure? A. Yes, sir, they do.”
He was not cross-examined as to their accuracy. These figures were taken from petitioner’s records.
Respondents’ witness, Nesser, whose firm specializes in appraisal work throughout the United States and had done the original appraisal of all property within Nassau County, testified as follows:
“ Q. I am talking about what value did you arrive at in using the replacement method less depreciation plus land. Did you arrive at a figure for that? A. That figure, yes.
*983 “ Q. What was that? A. $12,984,000.”
Later, he stated that replacement cost was $14,424,891! He then said that the figure of $12,984,000 represented the “ sound value ” (apparently of the whole investment) which he arrived at by using the replacement cost of $14,424,891, together with a capitalization figure of $12,504,262 to obtain a “ weighted average ’ ’ of $12,984,000. Since he ascribes a value of $4,000,600 to the land and, in his 11 Appraisal Supplement to the 1957 Report ’ ’ a value of $4,009,400, and since this land is nondepreciable, it follows that his estimate of the replacement cost of improvements, less depreciation is, by any computation that the court can make, not significantly different from the figures to which petitioner’s comptroller testified. It might be observed that Nesser at no time testified to the manner in which he arrived at his figure of $14,424,891. His 1957 report, which might have furnished this evidence, was never submitted.
Respondents’ witness Schneider, widely experienced in the construction of large public and commercial buildings, testified that the cost of reproduction of all buildings as of May, 1959, would be $10,457,665. Upon cross-examination it was developed that in his necessarily brief examination of the improvements he had made certain assumptions not in accordance with the facts. However, the court accepts it as being, on the whole, a fair and honest attempt to arrive at a figure made up from an extreme complexity of elements.
Weighing all the testimony, the court arrives at an approximate replacement cost of $10,250,000 from which it deducts 2% per annum for depreciation and economic obsolescence, resulting in the following values of the improvements:
1957 ............................$10,250,000
1958 ............................ 10,045,000
1959 ............................ 9,840,000
■ The final steps in this complex problem are to find a capitalized value of the whole, to deduct from it the value of the land as already found, to weigh the remainder with the cost of reconstruction less depreciation as found above, to add the cost of the land to the result, and finally to apply the ratio heretofore ascertained to these figures, thus arriving at the proper assessed valuation for land and improvements.
Three different applications of capitalization formulae were presented. Petitioner’s witness Edwards rejected the reproduction cost less depreciation valuation because, he said, the property has been “ over-expanded ”. There can be no doubt that the first estimates of the builders were overly optimistic. *984 Today two buildings remain uncompleted for lack of tenants, and of the total completed rentable area of 953,169 square feet, only 725,162 square feet were rented on May 1, 1957, 780,344 square feet on May 1, 1958 and 786,289 square feet on May 1, 1959.
Gertz Department Store occupies 300,000 square feet. In addition, there are a number of “ chain ” stores, such as food, bakery, variety and clothing stores. The balance consists of small, independently operated specialty shops. The experience with this latter class of tenants has been disappointing. There have been a number of failures and in some cases replacement tenants have not yet been found or obtained only by concessions and reductions in rent. Petitioner’s accounts show the following:

Moreover, the majority of the leases were based upon a minimum rent with a percentage of the gross business over a fixed minimum. All but 3 out of approximately 60 leases were based upon such a formula. Only 5 or 6 tenants ever paid rent in excess of their mínimums, and 3 of these became entitled to the return to such overage at the end of the year. Gertz Department Store, the largest tenant, however, was on a straight percentage lease.
It is true that the petitioner had a market survey made of the area and it is likewise true that it succeeded in obtaining a mortgage of $10,000,000, based upon a rent roll of $1,150,000 of approved tenants and an additional $1,000,000 based on a guarantee of an additional $70,000 in rent.
This mortgage covered, in addition to the 66-acre tract, an additional strip, 50 to 60 feet in width, running the length of the frontage, which was later taken by the State of New York for the widening of Broadway.
Nevertheless, it is clearly evident, not only from the petitioner’s books, but from a physical inspection of the premises, that the demand for space in the shopping plaza has fallen considerably short of expectations. Even respondents’ witness, Nesser, stated with qualifications, that there is an apparent overbuilding of shopping centers in Nassau County.
*985 At the time of the mortgage negotiations, it was anticipated that the center would have a gross rent potential of from $2,200,-000 to $2,400,000 per annum. It now appears both from the petitioner’s books and from a physical inspection of the premises, that the demand for space, as well as the volume of business done by its tenants, has fallen greatly short of such expectations.
The two possible explanations which seem most likely are first, that the area served does not at this time contain the potential buying power necessary to support these estimates; (although in time this situation may well improve as the population increases) and second, the competition from two other regional shopping centers in Nassau County, easily available by arterial highways and parkways, i.e., Roosevelt Field in Garden City, and Green Acres in Valley Stream, at both of which are located large department stores. Korvette’s, in Westbury, a department store in fact if not in name is still another source of competition. (It is now common knowledge that still another regional center soon will enter the construction stage in Huntington, just over the Suffolk County line. And, since this proceeding was tried, Davega’s, a ‘1 discount center ” covering many acres, has opened within a few miles of the subject property.)
The witness, Edwards, using his own “ economic capitalization ’ ’ formula, for the purposes of which he disregarded the mortgage and appraised the property as if it were free and clear, found by comparing income and expenses that the actual value of the whole, land and improvements, was as follows:
For the period of May 1,1957 to April 30, 1958......$5,759,400
For the period of May 1,1958 to April 30, 1959...... 5,853,700
On May 1, 1959................................... 5,055,500
the changes being due to fluctuation of rental income and operating costs and expenses (including increasing taxes). He used a 10% capitalization rate for the first 2 years, plus a constant depreciation factor of 1.6%. He increased the capitalization rate to 10.5% for the last year, because of conditions prevailing in the money market. In justification of this rate he stated that this investment involved considerable risk by reason of the large amount of unrented space after 3 years of operation.
To arrive at the above he took the actual rents received, the amounts due on the leases and the arrears, and assigned a value to the unrented space predicated upon the completion of all of the buildings, which completion he estimated, would cost $957,-900. Upon 'cross-examination, he stated that if he included the interest and amortization on the mortgage, he would arrive at a result which would show a deficit for the operation.
*986 When asked to explain why the mortgagee had advanced $11,000,000 to finance the project he stated: “ I think it was a crazy mortgage. It was an imprudent act * * * and I think it has proven itself so. If it hasn’t, I think it will soon.”
He estimated that the improvements would be depreciated in 50 years or at least suffer economic obsolescence even though among his operational expenses he allowed $50,000 per year for repairs. His depreciation rate of 1.6% per year was arrived at by allocating, arbitrarily, 80% of total value to the improvements, and 20% to the land and depreciating only the improvements.
Petitioner’s witness, Oppenheim, using a somewhat different capitalization formula, arrived at the following values for the land and improvements:
May 1, 1957 to April 30, 1958......................$5,850,000
May 1, 1958 to April 30, 1959...................... 5,400,000
May 1, 1959 to April 30, 1960...................... 5,150,000
which he averaged for all three years at $5,500,000, of which $950,000 was ascribed to the land and $4,550,000 to the improvements.
He did not evaluate the land by this capitalization method, but by an analysis of comparable sales in Nassau County and western Suffolk County, which resulted in a figure of $14,500 per acre. Although he spoke of a list of the sales which he had considered, it was not put into evidence.
The improvements were appraised by deducting operating expenses, in which were included insurance, a management allowance of 4% of the net income, leasing commissions, advertising and promotion, maintenance, legal and accounting expenses and taxes, and which he estimated at a total of $723,225, from what he designated as “ net estimated collections ”.
In arriving at this last figure the witness did not use the actual rent receipts. He stated that the minimum rent roll ‘1 guaranteed to the prospective mortgagee had been $1,478,240, based largely on percentage leases. This he explained as follows: 6 ‘ The guarantee is an expression used to indicate that the tenant commits himself to pay that minimum amount of rent regardless of the amount of business that he does. Nobody guarantees that they will perform their commitment.”
Instead he made an examination of the volume of business being done by each percentage lease tenant and computed the rent each store was earning on the basis of ‘6 the generally accepted percentage of rent that businesses of the particular type can afford to pay as against the volume of business they do
*987 As against a guaranteed minimum rent of $1,478,240 and rent of $1,238,000 actually collected as of 1958, he found, after deducting a “ vacancy factor ” of 5% in the case of Gertz Department Store and 10% in the case of all others, a “ net estimated collection ” of $1,166,963. (He ascribed a higher rental in the case of Gertz Department Store than called for by the lease, because he felt that rent was too low.) This left a total net income of $443,738 before mortgage charges.
This hypothetical net income after expenses but before taxes was $807,588. On the assumption that the tax assessment would be reduced to “ a fair value basis ’ ’, the witness capitalized this figure at 9%, plus 3.1% for the tax rate thus reduced, and arrived at a full value for the land and improvements of $6,674,280. Capitalized at a straight 9%, without this assumption, the witness’ appraisal, rounded out, was a total of $5,800,00, of which $950,000 represented the land, and $4,900,000, the improvements.
This witness’ appraisal was based in large part, not on actual receipts and expenditures, but on rents which he felt would be warranted by the actual volume of business done by each tenant, and upon estimates of what would be fair expenditures for such items as “ management “ advertising and promotion ”, “ legal and accounting ”.
Respondents’ witness, Nesser, used still a third method of appraisal which he characterized as a correlation of the replacement cost approach with the rental capitalization approach.
His capitalization valuation was arrived at as follows: He took the owner’s rent schedule, added certain rents not included in it, set up estimated rents for stores then vacant and the amount of rent in excess of the minimum rents provided by the leases, as of 1957-1958. From this he deducted a vacancy allowance of 1% and operating expenses before taxes, depreciation and interest resulting in a net figure of $1,074,110. Then he set up a capitalization rate that would include interest, taxes and depreciation, allowing 7% for interest, 3.4% for taxes and 1.06% for “ amortization [sic], for a total of 11.46%. However, in his appraisal he uses 2 different sets of figures to arrive at a capitalization rate of 10.67 % for the aforesaid net rentals before interest, taxes and amortization, and a rate of 11.46% to be applied to “ Overages and Mise, income reported 5/1/58 ”, which totaled $25,426. (The court is frank to confess that it can find no explanation in the record for this differentiation, or why it was made.)
The application of these capitalization rates to the net rentals and the “ overage ” result in a total valuation of $10,288,502. The witness then adds another factor entitled “ Vacancies ”, *988 computed by selecting a figure of $229,835, probably intended to be the rent estimated to be received from presently unfinished or unrented stores, subtracting 7 % of this for ‘ ‘ proposed vacancies and bad accounts ’ ’, allowing 8 years for a full rental of the project, but taking a fourth year average and applying to it still another unexplained capitalization rate of 11.86% to arrive at an indicated value of $1,375,117, for “ Vacancies ”.
A final factor — “Reversion” — is weighed and added. Assuming the land to be worth $4,009,391, both now and at the end of 30 years, and that the improvements to which he ascribes a present value of $10,992,593, will have a straight line total depreciation in 50 years and thus will be worth 20/50ths or $4,397,037 in 30 years, he arrives at a total of $8,406,428, which discounted over a period of 30 years has a value of $840,643, that being the present worth of the right to receive this property in 30 years.
Adding all the above elements, he obtains the following result: minimum rental capitalization... .$10,066,635
overage......................... 221,867
vacancies....................... 1,375,117
reversion ........'............... 840,643
total value by capitalization.. .$12,504,262
Mr. Nesser then assumes the replacement cost to be $4,009,391 for the land and $10,415,500 for the improvements — a total of $14,424,891. As explained by him he arrived at the land value merely by accepting the County Appraiser’s assessed valuation and applying to it his own ratio of 38.6%.
Finally, he gives a weight of 75% to his value by capitalization of $12,504,262 and of 25% to his replacement cost of $14,424,891 and adds the two results, thusly:
capitalization ................... $9,378,000
replacement .................... 3,606,000
fair market value............$12,984,000
The appraisal of real property is not an exact science and never can be so long as people may exercise freedom in selecting their investments. Nevertheless, there are certain elementary rules which must be observed when presenting opinion evidence to the court. When actual proof in the form of records is available to a witness, he may not assume the facts to be otherwise, ignoring this proof and making no attempt to dispute it. Where operating costs are itemized and records are available to sup *989 port them over the entire period of operation, an appraiser is not justified in allocating to these items an arbitrary percentage of gross income, which differs greatly from the petitioner’s actual claimed expenses. He may, if he can, attack these figures. He should not ignore them. This observation applies to the methods of both Oppenheim and Nesser.
A more serious objection to the methods employed by the last witness is the fact that he gave considerable weight to the mortgage on the property, his theory being that the interest rate of the mortgage should be weighed with the rate of return demanded by “ equity money ” according to the percentages of the whole investment represented by each. The result would represent the capitalization rate to be applied to the net income. It may be true that the presence or absence of a mortgage is of great concern to a prospective investor. It should be of no concern to a tax assessor.
Assuming, for illustration, that two identical properties, producing the same net income (before mortgage interest and amortization) exist side by side. One is mortgaged to the extent of 50% of its value, the other is free and clear. They both produce $10,000 per annum. If weight is given the mortgage, the interest rate of which is 6%, the following results:
50% first mortgage at 6% = 3%
50% equity at 9% = 4%%
Weighted Capitalization Rate 7%%
Valuation = $10,000 -4- .075 = $133,333.33.
The valuation of the other property is income capitalized at 9% or $10,000 -T- .09 = $111,111.11.
The replacement costs of these properties are identical. The owners are entitled to identical assessed valuation. It would impose an impossible burden on assessors if they were required to investigate the interest rate and the unpaid balance of the mortgage, if any, on each investment property on the assessment rolls to determine its proper assessed valuation.
It appears to the court that none of these 3 different applications of the capitalization of income theory are entirely satisfactory for the purposes of this proceeding. Mr. Edward’s method, however, seems from the proof and from the available figures of income and expense to be the most realistic.
The court concludes, after giving due weight to the credible evidence, particularly to petitioner’s Exhibits “ 8 ” and “ 9 ”, the vacancy factor and after considering the unreported rent from the space rented to concessionaires, e.g., the amusement *990 area, the pretzel stands, and the outside telephone booths, that a fair estimate of the net rental after taxes, but before mortgage charges, is approximately $800,000 per annum.
In arriving at a fair capitalization rate, the return an investor could rightfully expect, it has considered 4 factors, to wit, the “safe rate” for money, the risk rate, the liquidity of the investment, and the investment management required.
In the present money market, it is well known that a fully secured mortgage on commercial property commands interest at 5%% to 6% (and often a bonus in the form of “ points ”). Corporate bonds, with a high degree of security and liquidity, virtually no risk and absolutely no management costs, yield as high as 5%. It appears to the court from the testimony and from its own knowledge and experience, that this investment, which combines a substantial degree of risk with a low degree of liquidity, and places a considerable burden of management on the investor, should command a return of between 9% and 10%. Accepting the lower figure and applying it to the net income of $800,000, produces a capitalized valuation of $8,888,889, rounded at $9,000,000, for both land and improvements, with the value of the land, as aforesaid, being fixed at $1,980,000.
Since the improvements consist of a number of structures completed or remodeled at various times (such as the completion of the third floor of the Gertz building at a cost of $250,000) and since no actual proof was presented as to the proper rates of depreciation to be applied, the court offsets that factor by the new construction and remodeling for the 3 years involved. (At this stage of the center’s existence, economic obsolescence carries no significant weight — in any event, none was proven.)
When the value of the land is added to the replacement cost of the improvements, as computed above at $10,250,000, the result is $12,230,000.
The difference in the two valuations is accounted for, at least in part, by the undeniable fact that this property has not reached its full income potential. It is impossible to estimate when, if ever, this will be achieved. Nevertheless, some consideration must be given to it in fixing a fair value.
Giving due weight to both methods of appraisal, as well as to the likelihood that at some indeterminate time the rest of the buildings will be completed and income-producing, and that the present high vacancy factor will stabilize at a lower figure, and basing its decision on all of the evidence, on many personal inspections of the premises and on its own general knowledge of the elements by which value is established, the court find's the *991 fair value for tax assessment purposes for each of the three tax years in question to be: land, $1,980,000; improvements, $8,020,000; total, $10,000,000.
It further finds that when the proper ratio, heretofore found to be 35.88% is applied to this, the resultant assessed valuation for each of the years in question should be $3,588,000, of which $710,424 is the assessed value of the land.